**Karel SHAW, Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANIES,**
Appellee.

No. S–9257.

Supreme Court of Alaska.

March 16, 2001.

William D. Artus, Artus & Choquette, P.C., Anchorage, for Appellant.

Joe M. Huddleston, Hughes, Thorsness, Powell, Huddleston & Bauman, LLC, Anchorage, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. *INTRODUCTION*

Karel Shaw was sitting in her Ford Thunderbird when Patrick Murphy leaned from his pickup truck and shot her six times, leaving her a quadriplegic. Because Shaw's damages far exceeded the limits of Murphy's automobile insurance policy, Shaw sued her own insurance carrier, State Farm, seeking coverage for "bodily injury ... caused by accident arising out of the operation, maintenance[,] or use of an uninsured ... or underinsured motor vehicle." Both parties moved for summary judgment. The superior court

granted State Farm's motion and denied Shaw's motion. Because there is a material dispute about whether Murphy used his pick-up to stalk and trap Shaw before shooting her, we reverse the grant of summary judgment to State Farm and remand for further proceedings.

## II. *FACTS AND PROCEEDINGS*

Karel Shaw and Patrick Murphy were involved in a six-year relationship that Shaw ended in October 1996. Murphy continued to call Shaw and try to see her over the next six months, but never threatened her.

On April 23, 1997, Shaw planned to attend a fund-raiser at the Fly By Night Club. Before going to the Fly By Night Club, Shaw met a friend at Eddie's Sports Bar. Murphy came into Eddie's a short time later. He was angry, combative, and drinking heavily. After Shaw left Eddie's to go to the Fly By Night Club, Murphy also left Eddie's and drove through the parking lot of the Fly By Night Club looking for Shaw.

Shaw left the Fly By Night Club and went home. She told her daughter that she had seen Murphy drinking heavily at Eddie's and had been told that he was looking for her in the parking lot of the Fly By Night Club. Shaw called a friend, and arranged to go over to his home. Before leaving, she warned her daughter that Murphy might come to the house and told her not to open the door to him or anyone else. When Shaw left her home, she drove west on Sentry Drive to the stop sign at the corner of Sentry Drive and Independence Drive, intending to turn right onto Independence Drive.

What happened next is disputed. According to Shaw, Murphy drove his truck down the left hand (eastern) lane of Independence Drive, Shaw's intended lane of travel, and thus prevented Shaw from turning right. Murphy then turned sharply in front of Shaw, again preventing her from turning. He stopped his truck within six to eight inches of the driver's side of Shaw's car, so close that Shaw was afraid the two vehicles would hit if she went forward or turned. Murphy's window was down. Shaw insists

that she would have driven on instead of waiting for Murphy to approach her had he been on foot, and would not have opened the door for Murphy had he come to her house.

According to State Farm's expert, however, Murphy had binoculars in his truck, and was probably lying in wait for Shaw on the west side of Independence Drive. After spotting Shaw, Murphy pulled across Independence Drive and came up beside Shaw's car, stopping approximately two to three feet away. Both Murphy's and Shaw's driver's side windows were fully open. In her statement to the Anchorage Police Department, Shaw stated that she "slowed down for [Murphy]." She intended to tell Murphy to "leave [her] alone and go home."

What happened next is not disputed. Murphy took a .45 caliber Glock pistol from the seat of his pickup, steadied his aim on the truck's door, and shot Shaw six times. Murphy then shot himself in the head. Shaw's car rolled forward and butted into a snowbank on the far side of Independence Drive. Murphy died, and Shaw was left a quadriplegic.

Murphy's automobile insurance coverage was limited to $50,000 per person. As Shaw's damages exceeded $50,000, she demanded payment under the uninsured/underinsured motorist provision of her State Farm insurance policy. Her policy limit under the uninsured/underinsured motorist provision was also $50,000. State Farm refused to pay. Shaw then sued State Farm. State Farm moved for summary judgment and Shaw filed a cross-motion for summary judgment. The superior court granted State Farm's motion for summary judgment and denied Shaw's cross-motion. Shaw appeals contending that the court erred in granting State Farm's summary judgment motion and denying her cross-motion.

## III. *DISCUSSION*

### A. *Standard of Review*

"We review a grant of summary judgment de novo, applying our independent judgment."[1] We will uphold a grant of summary

1. *Fejes v. Alaska Ins. Co.,* 984 P.2d 519, 520 (Alaska 1999).

judgment "if no issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law."[2] "All reasonable inferences of fact are drawn in favor of the nonmoving party".[3] "The moving party bears the initial burden of proving, through admissible evidence, the absence of genuine factual disputes and its entitlement to judgment."[4]

### B. Did the Superior Court Err When It Granted State Farm's Motion for Summary Judgment and Denied Shaw's Cross–Motion?

Shaw's insurance policy provided coverage for "bodily injury ... caused by accident arising out of the operation, maintenance[,] or use of an uninsured ... or underinsured motor vehicle." State Farm admits that Shaw was shot by Murphy, and does not contest Shaw's contention that Murphy's vehicle was underinsured. Shaw's injuries will thus be covered by her State Farm policy if they were (1) caused by an "accident" that (2) arose out of the "operation, maintenance[,] or use" of Murphy's truck.

#### 1. Were Shaw's injuries caused by "accident"?

■ At the outset Shaw argues that her injuries were caused by "accident," noting that an intentional event may nonetheless be an accident within the policy language if it is both unexpected and unintended by the injured party:

[I]n analyzing whether a particular incident is an "accident" for purposes of uninsured motorist coverage, the courts should view the incident from the injured party's perspective. Thus if the event causing the

injury is unintended and unexpected from the injured party's viewpoint, the injury is deemed to have occurred as a result of an accident.[5]

State Farm does not take issue with this principle, or even mention it on appeal. In the superior court State Farm adverted to this principle, but explicitly declined to contest it.

■ We agree with Shaw on this point. What counts as an "accident" is not defined by Shaw's insurance policy. When the language of a policy provides no guidance in the definition of its terms, we may determine the policy's meaning by examining case law interpreting similar provisions.[6] We have previously "defined the term 'accident' as 'anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected.' "[7] Further, we have held that whether an occurrence is unanticipated, unforeseen, and unexpected is to be determined from the perspective of the insured.[8] Shaw, of course, was the "insured" under her State Farm policy. State Farm has not contested Shaw's assertion that "[t]he shooting was completely unexpected," and that until she saw the gun in Murphy's hand she had "[no] indication of any kind that [he] would shoot [her]." Accordingly, Shaw's injuries were caused by "accident."

We would need to say no more were it not for an apparent conflict between our holding here and one of our statements in a recently decided case, Kim v. National Indemnity Co.[9] In Kim, we briefly addressed the question of whether a minor who had been sexually assaulted by a cab driver was entitled to recover under the uninsured motorist provision of the cab driver's insurance policy.[10]

**2.** Id.

**3.** Id.

**4.** Id.

**5.** State Farm Mutual Auto. Ins. Co. v. Blystra, 86 F.3d 1007, 1011 (10th Cir.1996). .

**6.** See Fejes, 984 P.2d at 522.

**7.** Id. at 523 (quoting INA Life Ins. Co. v. Brundin, 533 P.2d 236, 242 n. 23 (Alaska 1975)).

**8.** See C.P. v. Allstate Ins. Co., 996 P.2d 1216, 1223 (Alaska 2000) ("Absent contract language clearly specifying an objective perspective, our practice of enforcing the insured's reasonable expectations requires us to determine whether the loss was the result of an accident from the perspective of the insureds claiming coverage.").

**9.** 6 P.3d 264 (Alaska 2000).

**10.** Id. at 269.

We first held that the cab driver was not covered by his general insurance agreement, which restricted coverage to injuries caused by "accident"—because the driver's abuse of the minor was intentional, not accidental.[11] We further held that "the uninsured motorist provision does not cover [the minor] L.W.'s injury for the same reasons that the general insuring agreement does not: L.W.'s injury did not result from an 'accident.' "[12] Under the general insurance agreement, however, it was the cab driver who was the "insured"; under the uninsured motorist provision, by contrast, it was the *minor* passenger who was the "insured." Because the intentional assault was not expected by the victim, what was not an accident from the perspective of the insured cab driver could still have been an accident from the perspective of the insured minor. To the extent that our statement in *Kim* suggests otherwise, it is overruled.

The result in *Kim* was correct based on the briefing in that case. In arguing that the minor's injuries should be covered under the uninsured motorist provision, the appellant in *Kim* argued that if liability coverage *would* have been provided under the general insurance agreement but for the presence of a separate abuse and molestation exclusion, then coverage should *still* be provided under the uninsured motorist provision because the abuse and molestation exclusion did not apply to that provision and public policy would not bar such a result for the molester would not benefit. Our holding that liability coverage would *not* be provided under the general insurance agreement (regardless of the abuse and molestation exclusion),[13] however, defeated the appellant's conditional argument for coverage under the uninsured motorist provi-

sion. Because the appellant in *Kim* did not argue that the abuse could have been an "accident" from the minor's perspective even though it was not an "accident" from the tortfeasor's perspective, he abandoned that point on appeal.[14]

2. *Did the accident arise out of the "operation, maintenance, or use" of Murphy's truck?*

■ The crux of the parties' dispute is whether the accident arose out of the "operation, maintenance, or use" of Murphy's truck. Shaw argues that Murphy "used" his truck to stalk her, trap her, surprise her, and shoot her.[15] State Farm argues, to the contrary, that it was mere coincidence that Murphy shot Shaw from his truck, and that Murphy's "use" of his truck thus had no legally significant causal connection to the shooting.

In *Criterion Insurance Co. v. Velthouse,* we had occasion to address the question of when an injury arises out of the "use" of a motor vehicle.[16] Mack Velthouse, while "horsing around" with friends in his parked vehicle, picked up a loaded shotgun and accidentally shot James Harman.[17] Harman sought coverage under Velthouse's insurance policy, which extended coverage to "bodily injury ... arising out of the ownership, maintenance, or use of the owned auto."[18] We noted in *Velthouse* that there must be "*some* causal connection between the 'use' of the vehicle and the injury."[19] Observing that there is an insufficient causal connection between the "use" of a vehicle and an injury where the vehicle is the mere "situs" of the injury-causing accident,[20] we approvingly cited those "more recent cases" which "refuse[d] to interpret 'use' as meaning other than use of the vehicle in its inherent status

---

11. *Id.* at 267.

12. *Id.* at 269.

13. *See id.* at 267.

14. *See Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991).

15. Shaw also argues that the shooting arose out of the "operation" of Murphy's truck even if it did not arise out of the truck's "use." Because we hold, *infra,* that the superior court erred in

granting summary judgment against Shaw on the "use" argument, we need not reach her "operation" argument.

16. 751 P.2d 1 (Alaska 1986).

17. *Id.* at 1–2.

18. *Id.* at 2.

19. *Id.* at 3.

20. *Id.* at 5.

as a vehicle."[21]  But we noted that most courts do not require "proximate cause in its strict legal sense;" rather they "only require that the vehicle be more than the mere situs of the accident and that the use of the vehicle relate to its inherent use as a motor vehicle."[22]  Because the accident could just as easily have occurred in a field or in the home as in Velthouse's parked truck, we held that it had no connection with the "use" of Velthouse's vehicle as a matter of law.[23]

Our holding in *Velthouse* is paralleled by the Minnesota Supreme Court's subsequent decision in *Continental Western Insurance Co. v. Klug*.[24] In *Klug*, the court noted that "[t]he legal issue of whether an accident arises out of the use ... of an automobile is a recurring question which defies a simple test. Instead, each case presenting such a question must, to a great degree, turn on the particular facts presented."[25]  Russell Klug was driving home from work when Daniel Bahe, a coworker, pulled up beside him and shot him with a shotgun.[26] As Klug accelerated, Bahe fired a second shot, sped up and rammed Klug from behind, and chased Klug down the highway until Klug was able to duck onto an exit ramp and escape.[27]

The Minnesota court set out three general factors to consider when addressing the issue of whether an accident arises out of the "use" of an automobile:

(1) "[T]he extent of causation between the automobile and the injury";[28]

(2) "[W]hether an act of independent significance occurred, breaking the causal link between 'use' of the vehicle and the injuries inflicted";[29] and

(3) "[W]hat type of 'use' of the automobile was involved."[30]

The Minnesota Supreme Court eventually concluded that the requisite degree of causation existed, noting that Bahe had used his car to keep up with Klug for over two miles in order to try to shoot him, had not left his car before shooting Klug, and had used his car not only to maneuver himself into a position to harm Klug but also to maneuver Klug into a position from which Klug could be harmed.[31]

Although the parties dispute the circumstances surrounding the shooting, Shaw's account of the attack resembles the Minnesota Supreme Court's description of the attack on Klug. According to Shaw, the shooting was simply the last act in Murphy's nightlong use of his truck to stalk her and trap her in a position where she could be harmed.  Moreover, Shaw alleges that Murphy's attack required the use of his truck *as* a truck.  Shaw insists that she would have kept driving if Murphy had not blocked her with his pickup, would not have waited for Murphy to approach her in her car had he been on foot, and would not have let Murphy into her home had he come to the door.

According to State Farm's account, by contrast, Murphy was not stalking Shaw in his truck, but simply happened to be waiting in it for her to emerge from her home.  State Farm also argues that Murphy's truck did not block Shaw from turning onto Independence Drive, but that she slowed of her own accord to talk to Murphy.  Finally, State Farm insists that Murphy could just as easily have come up to Shaw's car on foot to shoot

---

21.  *Id.* at 4 (citing cases finding, for example, that the "use" of a vehicle as a gun rest was an intervening cause of injury barring insurance coverage).

22.  *Id.* at 3.

23.  *Id.* at 5.

24.  415 N.W.2d 876 (Minn.1987).

25.  *Id.* at 877–78 (quotation omitted).

26.  *Id.* at 877.

27.  *Id.*

28.  *Id.* at 878 (holding that the vehicle must be an "active accessory" in causing the injury, a causation standard which involves "something less than proximate cause in the tort sense and something more than the vehicle being the mere situs of the injury").

29.  *Id.*

30.  *Id.* (holding that "coverage should exist only for injuries resulting from use of an automobile for transportation purposes").

31.  *Id.* at 878–79.

her while she waited to tell him to leave her alone and go home.

## IV. CONCLUSION

As the Minnesota Supreme Court suggested in *Klug*, whether Shaw's shooting arose from the "use" of Murphy's truck depends, to a great degree, on the particular facts of the case.[32] Because those material facts are in dispute, the superior court correctly ruled that Shaw was not entitled to summary judgment but erred in granting summary judgment to State Farm. Accordingly, we REVERSE the judgment of the superior court and REMAND for further proceedings.