Uwe KALENKA, as personal representative of the Estate of Eric Kalenka, Appellant,

v.

**INFINITY INSURANCE COMPANIES, Appellee.**

No. S–13781.

Supreme Court of Alaska.

Oct. 14, 2011.

---

20. Amicus State of Alaska's Response at 8.

See also, 2009 WL 8473850; 2005 WL 6731666.

Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellant.

Rebecca J. Hozubin, Wilkerson Hozubin, Anchorage, for Appellee.

Before: FABE, WINFREE, and STOWERS, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

After a minor collision between two vehicles in the drive-through line of a Taco Bell, Jack Morrell, the driver of one vehicle, stabbed and killed Eric Kalenka, the driver of the other vehicle. Morrell was uninsured and Kalenka's policy provided coverage for liabilities arising out of the "ownership, maintenance, or use" of an uninsured motor vehicle. Kalenka's automobile insurer filed an action in superior court, seeking a declaration that Kalenka's policy did not provide coverage for Kalenka's death. The superior court concluded that there was no general liability coverage under the policy. Uwe Kalenka, the personal representative of Eric Kalenka's estate, appeals the denial of liability coverage. We affirm the superior court's determination that Kalenka's policy does not provide liability coverage.

## II. FACTS AND PROCEEDINGS

### A. Facts

Around 3:00 a.m. on February 27, 2004, Eric Kalenka was driving a rented Subaru station wagon through the drive-through of a Taco Bell in the Mountain View neighborhood of Anchorage. While Kalenka's car was in line, it was rear-ended by a Chevrolet

Suburban. Kalenka exited the car to assess the damage. The driver of the Suburban, Jack Morrell, also exited and began arguing with Kalenka. Morrell threatened Kalenka and Christine Montague, Kalenka's girlfriend and passenger. Kalenka returned to his car and stood outside it. Kalenka called the police with his cell phone. Morrell followed Kalenka to the Subaru and stood very close to Kalenka, yelling at Kalenka as he placed the call. While Kalenka was leaning against the Subaru and speaking with the police dispatcher, Morrell began shoving Kalenka. Kalenka handed the phone to Montague through the driver's side window and told her to speak to the police. Kalenka and Morrell scuffled, moving behind the Subaru and then in front of it. During this fight, Morrell produced a knife and stabbed Kalenka multiple times. When the parties separated, Kalenka returned to the driver's seat of the Subaru, sat down, and closed the door. The police arrived very soon thereafter and apprehended Morrell. Kalenka was taken to Alaska Regional Hospital where he was pronounced dead. The Alaska medical examiner determined that the cause of death was multiple stab wounds.

Though Morrell had been driving the Suburban, it was owned by Morrell's cousin, William Wassili, who was in the passenger's seat at the time of the collision. Paul Wassili, another cousin, was in the back seat of the Suburban. All three had been at Chilkoot Charlie's, a bar in the Spenard neighborhood of Anchorage, until it closed at 2:30 a.m. An officer who interrogated Morrell testified that he was able to smell alcohol on Morrell's breath, and a blood test documented the presence of alcohol and marijuana in Morrell's system. Morrell was later convicted of second-degree murder.[1]

## B. Proceedings

On June 14, 2004, Infinity Property and Casualty Insurance Corporation (Infinity), Kalenka's automobile insurer, filed an action in superior court seeking a "declaration that there is no uninsured or medical payments coverage under the policy." Uwe Kalenka, as personal representative of the estate of Eric Kalenka, filed a counterclaim seeking money he alleged was owed to the Kalenka Estate under the terms of Kalenka's policy.

### 1. The April 29, 2005 summary judgment ruling

On September 6, 2004, the Kalenka Estate filed a motion for summary judgment. Infinity filed a cross-motion for summary judgment on January 12, 2005. Superior Court Judge Morgan B. Christen ruled that there were genuine issues of material fact as to whether Eric Kalenka was "occupying" the vehicle during the stabbing. Kalenka's policy requires that the insured be "occupying" the vehicle to be covered, and the policy defines "occupying" as "in, upon, entering into, or exiting from." The superior court held that there was a controversy as to where Kalenka was located when he was stabbed and whether or not he was "occupying" the vehicle. The superior court also held that it could not determine as a matter of law whether Kalenka's injuries were the product of an "accident," another prerequisite for coverage. At the time of the superior court's ruling, Morrell had not yet been convicted of second-degree murder, and the superior court concluded that it could not "determine as a matter of law whether Mr. Morrell intentionally inflicted the bodily injury."

Kalenka's policy provides uninsured motorist coverage if the injury arose out of the "ownership, maintenance, or use of the uninsured motor vehicle." The superior court granted partial summary judgment to Infinity on the claim that Kalenka's injuries did not arise out of the "use" of the Suburban, the vehicle Morrell was driving. But the superior court ruled that it could not grant summary judgment on whether the injuries arose out of the "ownership" or "maintenance" of the vehicle.

### 2. The September 15, 2005 summary judgment ruling

Infinity filed a second motion for summary judgment on July 13, 2005, seeking a ruling that Kalenka's injuries did not arise out of

---

1. *Morrell v. State*, 216 P.3d 574, 575 (Alaska App.2009).

the "ownership" or "maintenance" of the vehicle driven by Morrell. Infinity attached the recording of Christine Montague's 911 call to prove that Morrell "intentionally inflicted the bodily injury." The Kalenka Estate filed an opposition, and the superior court denied the motion on September 15, 2005.

### 3. The October 30, 2006 summary judgment ruling

Infinity filed a third motion for summary judgment on February 15, 2006. In this motion, Infinity again sought a ruling that Kalenka's policy did not provide coverage. Infinity emphasized the testimony before the grand jury that indicted Morrell. Infinity argued that this testimony established that the stabbing had been intentional. Infinity also reiterated the arguments from its first motion for summary judgment, arguing again that (1) Kalenka was not "occupying" his vehicle at the time of his injuries and that (2) the incident did not constitute an "accident" within the meaning of the policy. The Kalenka Estate opposed and filed a cross-motion for summary judgment on August 15, 2006. The superior court held that since Kalenka was leaning against the vehicle when the fight began, he was "occupying" the vehicle. But the superior court otherwise denied the motion and cross-motion for summary judgment.

On February 27, 2006, the Kalenka Estate filed a wrongful death suit against Morrell, William Wassili, Chilkoot Charlie's, and the Municipality of Anchorage.

### 4. The trial

A trial was conducted on March 28, 2008. In the superior court's words, the trial was "unconventional" since both sides had submitted "prefiled testimony" and were present only to deliver closing arguments. The superior court concluded that coverage did exist under Part B, the portion of the policy covering medical expenses. As to Part C, the portion of the policy covering liability caused by uninsured motorists, which is the subject of this appeal, the superior court held that Kalenka's death did not arise out of either the "use" or "maintenance" of the automobile

Morrell was driving, but his death could have arisen out of the "ownership" of the vehicle "if Mr. Kalenka's death arose from negligent entrustment of the uninsured Suburban." But the superior court held that "a preponderance of the evidence did not support a finding of negligent entrustment."

### 5. Motion for reconsideration

The Kalenka Estate then filed a motion for reconsideration, arguing that it never sought a ruling on the underlying tort claim regarding whether there was negligent entrustment or maintenance by Wassili. The superior court accordingly vacated its "rulings on the underlying tort of negligent maintenance or negligent entrustment." The court was "convinced that the Estate intended to preserve its opportunity to prove its negligent entrustment claim in a separate action." The court held that if the Kalenka Estate "can prove that [Eric] Kalenka's injuries arose from the maintenance or ownership of the uninsured vehicle, Part C of the policy will provide coverage." That is, if the Kalenka Estate could prove in its suit against William Wassili that Wassili's negligent entrustment or maintenance of his vehicle caused Kalenka's death, then Part C would provide coverage.

### 6. The December 10, 2009 ruling on summary judgment

On March 26, 2009, Infinity filed another motion for summary judgment on the Estate's negligent entrustment and maintenance claims. The Kalenka Estate filed an opposition. On September 25, 2009, the court of appeals affirmed Morrell's conviction for second-degree murder. The superior court case was reassigned to pro tem Superior Court Judge Peter G. Ashman, who granted summary judgment for Infinity. The superior court explained that the concerns prompting the court's earlier reconsideration were no longer relevant: The earlier ruling on the maintenance and entrustment claims "determined that neither party had requested a final ruling on their merits" and therefore concluded summary judgment was inappropriate at that time. As Infinity now sought a ruling on these claims, Judge Ashman concluded that judicial resolution of

those issues was appropriate. The superior court determined that the Kalenka Estate had presented insufficient admissible evidence to defeat summary judgment. The court also held that "Morrell's brutal and intentional assault of Eric Kalenka broke the chain of causation between Wassili's entrustment of his vehicle to Morrell and the damages suffered by Kalenka as a result of Morrell's actions."

The Kalenka Estate appeals the superior court's determination that Kalenka's death did not arise out of the "ownership, maintenance, or use" of Morrell's vehicle. The superior court's ruling that Part B of the policy provides coverage for medical expenses is not at issue in this appeal.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo, applying our independent judgment.[2] We will affirm if the record contains no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.[3] "A party opposing summary judgment need not prove that it will prevail at trial, but only that there is a triable issue of fact."[4] "Any evidence sufficient to raise a genuine issue of material fact, so long as it amounts to more than a scintilla of contrary evidence, is sufficient to oppose summary judgment."[5]

We review factual findings by the trial court for clear error.[6] "Clear error exists when we are left with a definite and firm conviction that the superior court has made a mistake."[7] This court reviews conclusions of law de novo and will adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[8]

## IV. DISCUSSION

### A. Part C Of The Policy Does Not Provide Coverage.

Alaska Statute 21.42.230 provides that "[e]ach insurance contract shall be construed according to the entirety of its terms and conditions as set out in the policy." Generally, we determine the liability of an insurer by the terms of the policy the insurer has issued.[9] Because insurance policies are contracts of adhesion, we have held that we will construe policies to match the insured's reasonable expectations.[10] We have explained that "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."[11] "[W]here a clause in an insurance policy is ambiguous in the sense that it is reasonably susceptible to more than one interpretation, we accept the interpretation that most favors the insured."[12]

#### 1. The policy

Though Kalenka was driving a rental car on the day of his death, his personal automobile policy still provided coverage. Part C of the policy provided for uninsured or underinsured motorists coverage:

> In exchange for **your premium payment,** we [Infinity] will pay [damages] not exceeding the limits shown on the **Declara-**

2. *Burnett v. Covell,* 191 P.3d 985, 987 (Alaska 2008).

3. *Shaw v. State Farm Mut. Auto. Ins. Cos.,* 19 P.3d 588, 589–90 (Alaska 2001).

4. *Indus. Commercial Elec., Inc. v. McLees,* 101 P.3d 593, 597 (Alaska 2004).

5. *Beal v. McGuire,* 216 P.3d 1154, 1161 (Alaska 2009) (internal quotation marks omitted).

6. *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 134 P.3d 343, 345–46 (Alaska 2006).

7. *Id.* at 346 (internal quotation marks omitted).

8. *Gilbert M. v. State,* 139 P.3d 581, 586 (Alaska 2006) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

9. *Jones v. Horace Mann Ins. Co.,* 937 P.2d 1360, 1362 n. 3 (Alaska 1997).

10. *Bering Strait Sch. Dist. v. RLI Ins. Co.,* 873 P.2d 1292, 1294–95 (Alaska 1994).

11. *Id.* at 1295 (quoting Robert Keeton, Basic Text on Insurance Law § 6.3(a), at 351 (1971)).

12. *C.P. ex rel. M.L. v. Allstate Ins. Co.,* 996 P.2d 1216, 1222 (Alaska 2000).

tions Page, which an **insured person** is legally entitled to recover from the **owner** or operator of an **uninsured motor vehicle** because of **bodily injury** caused by an **accident** and sustained by such **insured person.** The bodily injury must be caused by an **accident** and must arise out of the ownership, maintenance, or **use** of the **uninsured motor vehicle.**

The terms in bold are defined in the policy. "Uninsured motor vehicle" is defined as a "vehicle . . . not insured by a liability bond or policy at the time of the accident." The policy defines "accident" as "a sudden, unexpected, and unintended event causing bodily injury or property damage, arising out of the ownership, maintenance, or use of an auto." The policy also defines "use":

> "Use" of an **uninsured motor vehicle** or an **underinsured motor vehicle** means that such **vehicle** must be the main cause of a **bodily injury** or **property damage.** The **bodily injury** or **property damage** must not merely occur while the **uninsured motor vehicle** or **underinsured motor vehicle** is being used or operated. There must be an actual and causal connection between the **use** or operation of the **uninsured motor vehicle** or **underinsured motor vehicle** and the **bodily injury.** The **bodily injury** or **property damage** must not be expected nor intended from the standpoint of the driver or a passenger of the **uninsured motor vehicle** or **underinsured motor vehicle.**

Both the statement of coverage and the definition of "accident" require that covered injuries or property damage result from the "ownership, maintenance, or use" of an automobile. On April 29, 2005, Judge Christen granted partial summary judgment to Infinity and held that Kalenka's injuries did not arise out of the "use" of Morrell's automobile.

On March 16, 2010, Judge Ashman granted summary judgment to Infinity and held that Kalenka's injuries did not arise out of the "maintenance" or "ownership" of the vehicle.

### 2. "Use"

■ The superior court held that the policy did not provide coverage under the word "use." The court emphasized the fact that the definition of "use" required the vehicle to be the "main cause of a bodily injury." The court granted summary judgment to Infinity and held that "the uncontested facts here would not allow reasonable jurors to conclude that the uninsured vehicle was the main cause of Mr. Kalenka's bodily injury claim." According to the superior court, even if the use of the uninsured vehicle was a cause of Kalenka's injuries, the vehicle could not be said to be the "main cause."

The Kalenka Estate appeals this ruling and argues that Morrell's use of Wassili's Suburban was the main cause of Kalenka's death. According to the Kalenka Estate, Kalenka's injuries arose out of the use the Suburban because the collision of the Suburban with Kalenka's Subaru triggered the confrontation which ended Kalenka's life.

■ In *Criterion Insurance v. Velthouse,* we considered an insurance policy similar to the one in this case.[13] The policy in *Velthouse* provided coverage for "bodily injury . . . arising out of the ownership, maintenance or use of the owned auto."[14] Velthouse, the insured, was sitting in his car and picked up a gun he believed was unloaded.[15] The gun was in fact loaded, and Velthouse accidentally discharged it, injuring a passenger.[16] We held that, since the "vehicle was the mere situs of the accident," the policy did not provide coverage.[17] In *Shaw v. State Farm Mutual Auto Insurance Co.,* we held that automobile insurance could cover an in-

---

**13.** 751 P.2d 1 (Alaska 1986). Alaska law generally requires Alaska drivers to carry automobile insurance. *Progressive Ins. Co. v. Simmons,* 953 P.2d 510, 521 n. 13 (Alaska 1998); *see also* 7A COUCH ON INSURANCE § 109:1 (3d ed. 1995). The automobile insurance statutes of most states, including Alaska, require that insurance policies cover damages arising from the "ownership, maintenance, or use" of the vehicle. AS 28.22.101; 1 IRVIN E. SCHERMER & WILLIAM J.

SCHERMER, AUTOMOBILE LIABILITY INSURANCE § 5:1 (2004).

**14.** *Velthouse,* 751 P.2d at 2.

**15.** *Id.* at 1.

**16.** *Id.* at 1–2.

**17.** *Id.* at 5.

tentional assault.[18] Karel Shaw's ex-boyfriend shot her six times through his driver's side window.[19] Her insurance policy required that bodily injuries arise "out of the operation, maintenance, or use" of a vehicle.[20] The superior court granted summary judgment to State Farm.[21] We reversed and remanded.[22] We relied on *Velthouse* for the proposition that "there must be some causal connection between the 'use' of the vehicle and the injury."[23] Again referring to *Velthouse*, we noted that, when interpreting these provisions, courts in other states "do not require proximate cause in its strict legal sense; rather they only require that the vehicle be more than the mere situs of the accident and that the use of the vehicle relate to its inherent use as a motor vehicle."[24] We also quoted three general factors used by the Minnesota Supreme Court in *Continental Western Insurance Co. v. Klug* to determine when there was sufficient causation:

(1) The extent of causation between the automobile and the injury;

(2) Whether an act of independent significance occurred, breaking the causal link between "use" of the vehicle and the injuries inflicted; and

(3) What type of "use" of the automobile was involved.[25]

In *Shaw* we concluded that the determination of whether there was "use" of the vehicle depended "to a great degree, on the particular facts of the case" and therefore held that summary judgment for the insurer was inappropriate.[26]

In *Shaw* we quoted *Klug* for the proposition that the vehicle must be an "active accessory" for there to be an adequate causal relationship (the first element of the *Klug* test).[27] In *Klug*, the insured was driving home from work when a coworker drove up next to him and opened fire with a shotgun, hitting Klug in the arm.[28] His coworker pursued Klug for two miles before Klug was able to escape.[29] The Minnesota Supreme Court held that the coworker's vehicle was an "active accessory" to Klug's injuries.[30] Similarly, in *Shaw*, Shaw's ex-boyfriend may have used his vehicle to corner and trap Shaw, and we held that there was therefore a genuine issue of material fact as to whether there was coverage.[31] Here, however, the vehicle driven by Morrell was not an "active accessory" to Kalenka's injuries. The collision between Morrell's and Kalenka's vehicles was only the subject of their fight; the vehicles played no part in the fight itself. Accordingly, there was insufficient causation for Kalenka's death to have arisen out of the "use" of the vehicle Morrell was driving.

 We also conclude that here there was an intervening "act of independent significance." In *Shaw*, we clarified that an intentional act is not automatically an "act of independent significance."[32] We held that a driver's use of a vehicle to trap and corner another driver did not necessarily constitute an "act of independent significance" even though it was intentional.[33] In *Klug*, the Minnesota Supreme Court similarly held that

---

18. 19 P.3d 588, 593 (Alaska 2001).

19. *Id.* at 589.

20. *Id.* at 591.

21. *Id.* at 589.

22. *Id.*

23. *Id.* at 591 (quoting *Criterion Ins. Co. v. Velthouse*, 751 P.2d 1, 3 (Alaska 1986)) (internal quotation marks omitted).

24. *Id.* at 592 (quoting *Velthouse*, 751 P.2d at 3) (internal quotation marks omitted).

25. *Id.* at 592 (quoting *Cont'l W. Ins. Co. v. Klug*, 415 N.W.2d 876, 878 (Minn.1987)) (internal citations and quotation marks omitted).

26. *Id.* at 593.

27. *Id.* at 592, n. 28 (quoting *Klug*, 415 N.W.2d at 878).

28. *Klug*, 415 N.W.2d at 877.

29. *Id.* at 878.

30. *Id.*

31. *Shaw*, 19 P.3d at 592–93.

32. *Id.* at 591–93.

33. *Id.*

even though Klug's assailant was acting intentionally, the assailant's actions did not constitute an "act of independent significance." [34] The Minnesota Supreme Court stated that "[h]ad [the assailant] used his vehicle to drive ahead of Klug, left his vehicle, and shot Klug from the side of the road, we might have found an intervening act." [35] Here, Morrell did exit his vehicle prior to assaulting Kalenka and only attacked Kalenka after Kalenka began to call the police on his cell phone.

■ Infinity argues that the definition of "use" in the policy requires a stricter standard of causation than exists in our previous cases. Kalenka's policy included a definition of "use" which provided that " '[u]se' of an uninsured motor vehicle or an underinsured motor vehicle means that such vehicle must be the main cause of a bodily injury or property damage." Infinity argues that the definition of "use" was narrower in Kalenka's policy than in the cases discussed above that found coverage existed. But the phrase "ownership, maintenance, or use" is prescribed by statute; Alaska law requires that automobile insurance contracts must cover damages arising from the "ownership, maintenance, or use" of a vehicle.[36] In *Burton v. State Farm Fire & Casualty Co.*, we explained that "[i]nsurers are not permitted to issue policies containing provisions that reduce the scope of coverage below the legal minimum." [37] Infinity cannot limit what constitutes "use" of a vehicle by defining that term more narrowly than it is defined in the statute.

### 3. Negligent entrustment

■ The Kalenka Estate also argues that William Wassili, the owner of the Suburban driven by Morrell, negligently entrusted the Suburban to Morrell. The Kalenka Estate contends that "Wassili knew or should have known that Mr. Morrell was in no condition to drive his vehicle." The policy provides coverage for injuries arising from the "ownership, maintenance, or use" of the vehicle, and the Kalenka Estate argues that this negligent entrustment falls within the meaning of "ownership." [38]

■ We have defined what constitutes negligent entrustment: "[T]he owner or other person in control of a vehicle and responsible for its use who is negligent in knowingly supplying, entrusting, permitting or lending it to an incompetent or habitually careless driver is liable for negligent entrustment." [39] In 2007 we stated:

> Alaska recognizes the common law tort of negligent entrustment and follows the definition in the Restatement (Second) of Torts § 390 (1965), which states:
>
> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.[40]

For example, in *Kroll v. Paul,* a fisher was involved in a violent altercation with the crew of another boat.[41] We affirmed a negligent entrustment judgment against the lessor of the fisher's boat because the lessor knew or should have known that the fisher had a

---

34. *Klug,* 415 N.W.2d at 878.

35. *Id.*

36. AS 28.22.101(a).

37. 796 P.2d 1361, 1363 (Alaska 1990).

38. The Kalenka Estate relies on the word "ownership" for its negligent entrustment claim, but other courts, when examining whether such a claim is covered by an "ownership, maintenance, or use" clause, do not always focus exclusively on the word "ownership." *See, e.g., Dutton v. State Farm Mut. Auto. Ins. Co.,* 383 So.2d 519, 521 (Ala.1980) (examining whether alleged negligent entrustment arose out of the "use" of the vehicle).

39. *Neary v. McDonald,* 956 P.2d 1205, 1208 (Alaska 1998).

40. *Nelson v. Progressive Cas. Ins. Co.,* 162 P.3d 1228, 1232 (Alaska 2007).

41. Mem. Op. & J. No. 682, 1993 WL 13563648, at *1 (Alaska, Oct. 6, 1993).

"tendency to use boats in an assaultive manner." [42]

The Kalenka Estate argues that Morrell was intoxicated and that it would be "easy for the jury to infer that Mr. Wassili allowed Mr. Morrell to drive his car while Mr. Morrell was under the influence of alcohol and marijuana." Infinity counters that there was no evidence that "Wassili knew Morrell was an incompetent driver and that he was likely to use the vehicle in an unreasonable manner."

We conclude that, whether or not Wassili knew or should have known that Morrell was too intoxicated to drive, there is no evidence in the record that Wassili knew or should have known that Morrell was likely to commit assault. Some courts have held that there can be negligent entrustment liability for an intentional assault on a third party. For example, in *Morin v. Moore*, the Fifth Circuit reversed a 12(b)(6) dismissal for the defendant, a police officer, in a case where the police officer had allegedly negligently entrusted a government weapon to his mentally unstable son.[43] But in those cases, there was evidence that entrusting the object would increase the likelihood of an assault.[44] Here, there is no such evidence.

### 4. Negligent maintenance

The Kalenka Estate argues that William Wassili negligently maintained the brakes of his vehicle, and that this negligent maintenance caused the collision with the Subaru driven by Kalenka. Infinity counters that "there was no evidence to support appellant's negligent maintenance claim."

The Kalenka Estate alleges the Suburban's "rear brakes were not adjusted properly, and that the rear wheels would spin while the vehicle was stopped." The Kalenka Estate argues that "the correct focus is not whether the negligent maintenance was related to the stabbing" but rather that the "applicable focus is whether the negligent maintenance, which allowed the wheels to spin and propel the vehicle forward, was related to the fact that the vehicle ran into the rear of the Kalenka vehicle." Infinity counters that the allegation of negligent maintenance stems from one remark during Morrell's testimony at his trial in which Morrell commented that the brakes seemed to be faulty. Infinity argues that Morrell did not indicate that faulty brakes were what had caused him to collide with the Subaru driven by Kalenka.

As with the negligent entrustment claim, even if there is evidence that Wassili knew or should have known that his brakes were malfunctioning, there is no evidence in the record that such negligent maintenance would increase the likelihood of Morrell's committing an assault. There is no evidence that Wassili knew or should have known that failing to adequately maintain his vehicle would cause Morrell to commit an assault after driving the vehicle.

### B. Summary Judgment Was Appropriate On The "Ownership" And "Maintenance" Provisions.

After Superior Court Judge Christen ruled there were not sufficient facts alleged to support a claim of negligent entrustment, the Kalenka Estate filed a motion for reconsideration, and the superior court vacated its ruling on the merits of the negligent entrustment claim. Judge Christen explained that she was "convinced that the Estate intended to preserve its opportunity to prove its negligent entrustment claim in a separate action." Later, Infinity filed another motion for summary judgment, seeking a ruling on negligent entrustment. The newly assigned judge, Judge Ashman, granted summary judgment for Infinity and gave several reasons why summary judgment was now proper.

First, Judge Ashman explained that Judge Christen had reconsidered her "decision on [the negligent maintenance and entrustment

---

**42.** *Id.* at *8.

**43.** 309 F.3d 316, 325 (5th Cir.2002); *see also Byers v. Hubbard*, 107 Ohio App.3d 677, 669 N.E.2d 320, 323 (1995) (holding that there was a triable issue of material fact as to whether plaintiff's injury was foreseeable where the defendant lent his wife a handgun after his wife had an argument with the plaintiff and the wife shot the plaintiff).

**44.** *See Morin*, 309 F.3d at 325.

claims] because [she] determined that neither party had requested a final ruling on their merits." Because Infinity had filed a new motion for summary judgment and affirmatively requested a ruling on the merits of these claims, Judge Ashman determined that a ruling was now appropriate. Second, Judge Ashman reasoned that because the Kalenka Estate "could only raise such a claim against Wassili" and because the court presiding over the action between the Kalenka Estate and Wassili had already entered a default judgment against Wassili, "a ruling by this court now on negligent maintenance and entrustment would have little relevance to the underlying tort case."

The Kalenka Estate argues that there "were genuine issues of material fact which needed to be resolved" in the suit against Wassili. Infinity counters that "it filed its Complaint seeking a ruling from the trial court that there was 'no uninsured or medical payments coverage under the policy.' " According to Infinity, the question "whether there is coverage for benefits sought under the terms of the policy is a matter between the parties to the contract." Infinity argues that it therefore is entitled to a ruling on those issues, whether or not the Kalenka Estate would prefer to litigate them in another case.

We agree with the Kalenka Estate that an injured party is generally allowed to choose the forum in which to litigate a tort claim. Other courts have denied requests by insurers for declaratory judgments on the ground that litigating those declaratory judgment actions would interfere with an injured party's tort relief. In *Cunningham Brothers, Inc. v. Bail,* an alleged tortfeasor sought a declaratory judgment that it had not been negligent.[45] The Seventh Circuit held that such a declaratory judgment was inconsistent with the federal declaratory judgment statute, explaining that "to compel potential personal injury plaintiffs to litigate their claims at a time and in a forum chosen by the alleged tort-feasor would be a perver-

sion of the Declaratory Judgment Act."[46] The Maryland Court of Appeals has similarly analyzed the interplay between declaratory judgment actions involving insurance coverage and separate suits alleging direct tort liability:

> [A] declaratory judgment action prior to the underlying tort trial can be both a valuable and appropriate means of resolving questions of policy coverage when the question of policy coverage is independent and separable from the claims asserted in a pending suit by an injured third party. When a question sought to be resolved in the declaratory judgment proceeding would be decided in the pending tort action, however, it is ordinarily inappropriate to grant a declaratory judgment prior to resolution of the underlying tort trial.[47]

We agree that an insurer's interest in obtaining a declaratory judgment concerning its coverage should not displace an injured party's access to traditional tort relief.

But in this case, there was no reason for Judge Ashman to decline to decide the issues of negligent entrustment and negligent maintenance. Infinity initiated this litigation by filing an action for declaratory judgment on the limited question whether its policy provided coverage. It was the Kalenka Estate that elected to actively litigate the underlying tort issues in the declaratory judgment action. Indeed, in its response to Infinity's declaratory judgment complaint, the Kalenka Estate filed a counterclaim seeking the money it alleged was owed under the policy. In its counterclaim, the Kalenka Estate sought "the amount of the coverage limits of the . . . policy." And the Kalenka Estate did not alert Judge Christen to the existence of the separate tort suit against Wassili until it filed a motion for reconsideration. Judge Christen, out of an abundance of caution, reconsidered her earlier decision on these issues to give the Kalenka Estate a chance to preserve them for its direct tort litigation with Wassili. But by the time Judge Ashman made his decision on these issues two things had

---

**45.** 407 F.2d 1165 (7th Cir.1969).

**46.** *Id.* at 1167.

**47.** *Litz v. State Farm Fire & Cas. Co.,* 346 Md. 217, 695 A.2d 566, 573–74 (1997) (internal citations and quotation marks omitted).

changed. First, a default judgment had been entered against Wassili on the negligent entrustment claim against him. Second, it became apparent that the Kalenka Estate had not actually raised a negligent maintenance claim in its suit against Wassili. Thus, Judge Ashman's decision to resolve the negligent entrustment and negligent maintenance claims would not affect the Kalenka Estate's suit against Wassili. We therefore conclude that Judge Ashman did not abuse his discretion by granting Infinity's request for declaratory judgment.

## V. CONCLUSION

We AFFIRM the judgment of the superior court.

CARPENETI, Chief Justice, and CHRISTEN, Justice, not participating.