Georgianne SHEARS, Appellant,

v.

Dee Ann MYERS, as Trustee of the Jack Donald Bollinger Revocable Trust Agreement dated March 29, 2008, Appellee.

No. S–14056.

Supreme Court of Alaska.

July 20, 2012.

---

James Alan Wendt, Law Offices of James Alan Wendt, Anchorage, for Appellant.

Timothy R. Byrnes, Hughes Gorski Seedorf Odsen & Tervooren, LLC, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, and FABE and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

Two nieces, acting as co-guardians for their elderly uncle, sued their uncle's former caregiver for misuse and misappropriation of his assets; the caregiver counterclaimed for compensation for services rendered. After a bench trial, the superior court: (1) determined the caregiver had committed fraud and breached fiduciary duties; (2) awarded damages against the caregiver for her misuse and misappropriation of the uncle's assets; (3) awarded the caregiver some compensation for her services in quantum meruit; and (4) ordered the caregiver's name removed from title to the uncle's house. The caregiver appeals. Because the superior court's findings of fact are well supported, its conclusions of law are sound, and its application of equitable considerations was well within its discretion, we affirm its decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jack Bollinger lived most of his adult life in Alaska but had no family living in the state. Bollinger had significant assets and "relatively low expenses." Bollinger's health declined and in 2003, at age 76, he was diagnosed with senile dementia. In late 2004 he suffered a stroke. Bollinger subsequently worked with speech, physical, and occupational therapists.

Bollinger was friendly with Georgianne Shears's mother and family. After Bollinger's stroke Shears began giving him rides to pick up his mail and shop for groceries. She also assisted him by cleaning, cooking, helping him exercise, bathing him, and taking him to appointments. Bollinger said he paid Shears $1,000 a month for her help.

Shears took Bollinger to the bank each month, where he cashed his retirement and Social Security checks and gave the money to Shears because "[s]he said she needed it." Shears acknowledged Bollinger gave her money, explaining that she would accept it but remind him it was not part of her wages. Shears failed to provide Bollinger receipts for food and household purchases she made with his money. Shears was unable to identify whether approximately $130,000 in purchases she made were for Bollinger, herself, or both of them; nor did she know whether another approximately $180,000 in payments she made were on behalf of Bollinger, herself, or both of them.

In February 2005 Bollinger signed a power of attorney allowing Shears to act for him but with a restriction as to certain financial transactions. Two days later Bollinger executed a will bequeathing $100,000 to Shears and other significant assets to her family members. In March Bollinger added Shears's name to his checking account.

Bollinger had never owned a house, but in July 2005 Shears selected a house and Bollinger purchased it for about $300,000. Bollinger testified it was Shears's idea to move and buy the house. Shears asserted that Bollinger's speech therapist had told her Bollinger's physician was plotting to put him in a

"convalescent home" and had suggested Shears and Bollinger find a house together. The speech therapist denied there was such a plot and denied suggesting Bollinger would have to move to a "convalescent home" unless he and Shears bought a house.

Both Bollinger and Shears were listed as owners on the deed. Bollinger paid the entire down payment of approximately $150,000. Shears asserted Bollinger contributed her portion of the down payment in lieu of wages he owed her. In October Shears began paying about half the loan payment each month. Bollinger lived in the house's first floor but due to his physical limitations could not access the second floor—the main part of the house—that had been previously remodeled and was in better condition than the first floor.

In August 2005 Bollinger signed a second will, increasing Shears's financial interests. This will left the house to Shears and provided that any house debt be paid from Bollinger's estate in addition to the $100,000 bequest to Shears. In 2006, while Bollinger was hospitalized, Shears exercised her power of attorney to transfer $100,000 from his savings account to his checking account. In November 2006 Bollinger signed another power of attorney, removing the previous restrictions on Shears's authority over certain financial transactions.

In November 2007 approximately $67,000 of Bollinger's money was used to purchase a Cadillac Escalade for Shears. Shears had previously sold Bollinger's older Toyota for $10,000 and had kept the money.

In late 2007 Bollinger's dentist spoke with Bollinger's niece, Dee Ann Myers, expressing concern about Bollinger and Shears's relationship. Shortly thereafter another niece, Jana Smitley, contacted the State of Alaska, Department of Health and Social Services, Adult Protective Services (APS), which started an investigation. Myers and Smitley petitioned for guardianship of Bollinger and traveled to Alaska in February 2008. When Myers, Smitley, and Bollinger met with APS investigators, Bollinger was asked if he had felt pressured to buy the house and car. He replied, "you don't say no to [Shears]."

## B. Proceedings

Myers and Smitley were appointed Bollinger's co-guardians, and he moved to Missouri to live with Smitley. In July 2008 the co-guardians sued Shears for breach of fiduciary duties and exertion of undue influence over Bollinger to benefit herself. They sought: (1) an accounting of all transactions Shears had made with or on Bollinger's behalf; and (2) declaratory relief quieting title to the house to Bollinger and removing Shears from the title, or in the alternative, a court order to sell the house. They estimated Bollinger was owed about $215,000 due to Shears's financial mismanagement.

Shears counterclaimed, asserting that she had an oral contract with Bollinger to provide personal care, which set her hourly rate at $25.00, and that Bollinger breached the contract by failing to pay her full salary. She claimed Bollinger owed her $477,625. In the alternative, Shears asserted she should recover in quantum meruit.

The superior court held a five-day bench trial in September and October 2009. The court rejected Shears's assertion that she had an oral contract or any other agreement to provide Bollinger personal care attendant services. It found Shears "was not a credible witness," her testimony "was often rambling, evasive, and argumentative," and her explanations regarding alleged conversations with Bollinger and demands for wages were "frankly unbelievable."

The superior court determined Shears owed Bollinger fiduciary duties and therefore had the burden to account for all his assets and financial transactions made on his behalf. The court found that Shears "utterly failed to properly or reasonably account for her management and use of Bollinger's funds and finances." The court determined Shears breached her fiduciary duties and committed fraud in her use of Bollinger's assets. It also determined Shears, "with intent and using undue influence," acted fraudulently and in "gross" breach of her fiduciary duties by inducing Bollinger to buy the house, pay the down payment, and put her on the title.

The superior court adopted the co-guardians' accounting of Bollinger's assets. Based

on this accounting, the court determined Shears owed Bollinger $215,590, but Shears was owed $95,800 in quantum meruit for assisting Bollinger, including a weekly allowance for purchasing Bollinger's personal items.[1] The court also awarded Bollinger title to the house.

Before the superior court issued the final judgment and decree, Bollinger died. Myers, as trustee of Bollinger's revocable trust agreement, was substituted as the plaintiff.

Shears appeals.

## III. STANDARD OF REVIEW

■ "We review the trial court's findings of fact, including those on the credibility of witnesses, for clear error."[2] Clear error is found if, after a thorough review of the record, we are left with a "definite and firm conviction that a mistake has been made."[3] Factual findings are reviewed in the light most favorable to the prevailing party below.[4] "We grant particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[5] We review conclusions of law de novo and will adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[6] "[W]e review a trial court's decision on equitable relief for abuse of discretion."[7] "An abuse of discretion occurs when, after a review of the entire record, we are left with a definite and firm conviction that the trial court has erred in its ruling."[8]

## IV. DISCUSSION

Shears argues the superior court erred by: (1) recognizing the defense of unclean hands to her wage claim; (2) miscalculating the weekly allowance for reimbursable expenses; (3) applying a three-year statute of limitations to her wage and weekly allowance awards; and (4) awarding the house solely to Bollinger without awarding her any equity in it. Shears also contends the weight of the evidence is against the court's judgment.

■ We start with Shears's argument that the superior court's decisions are against the weight of the evidence. The superior court issued extensive preliminary findings of fact and conclusions of law, a portion of which is set out below:

> With intent and using undue influence, in January 2005 Shears persuaded Bollinger to rely on her, and she became his agent under a power of attorney. This created a fiduciary relationship that entailed, among other things, a duty to keep complete, accurate, and contemporary records of all financial transactions she was involved in that pertained to her use of Bollinger's funds, and that pertained to her oversight and management of Bollinger's financial affairs.
>
> With intent and using undue influence, Shears persuaded Bollinger to buy a large, two-story house on Joseph Street in Anchorage, for which he was induced to pay $150,000 down; she persuaded him to put her name as co-owner on the house's title. Shears lived upstairs, which was in excellent condition, having recently been remodeled with fine appointments; Bollinger

**1.** The co-guardians conceded Shears was owed $95,800 for her services and expenses. The superior court indicated that, but for the co-guardians' concession, the court would have been inclined to award Shears nothing.

**2.** *Safar v. Wells Fargo Bank, N.A.*, 254 P.3d 1112, 1117 (Alaska 2011) (citing *Romero v. Cox*, 166 P.3d 4, 7–8 (Alaska 2007)).

**3.** *Id.* (quoting *Romero*, 166 P.3d at 8).

**4.** *Id.* (citing *Romero*, 166 P.3d at 8).

**5.** *Id.* (quoting *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)) (internal quotation marks omitted).

**6.** *Kalenka v. Infinity Ins. Cos.*, 262 P.3d 602, 607 (Alaska 2011) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

**7.** *Cook v. Cook*, 249 P.3d 1070, 1082–83 (Alaska 2011) (citing *In re Estate of Fields*, 219 P.3d 995, 1002 (Alaska 2009)).

**8.** *Id.* at 1077 (quoting *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003)) (internal quotation marks omitted).

lived downstairs in a much more spartan living area....

Within weeks of closing on the house, with intent and undue influence, Shears persuaded Bollinger to make her the personal representative under his will, and the beneficiary of significant bequests. She arranged to have him leave the Joseph Street house to her upon his death, and to pay off the remaining mortgage balance from the assets of his estate. She arranged that the will bequeathed her $100,000, as well as large bequests to her family members.

With intent and using undue influence, Shears obtained authority as co-signer over Bollinger's checking account in March 2005, and she wrote all of his checks. She transferred money from his saving account to his checking account, giving her access to his money. She took him to the bank monthly, where he would cash his monthly retirement and/or social security checks, and with intent and using undue influence, she then persuaded him to give her the cash (usually in the approximate amount of $3,000 per month). She spent or converted much if not most of his retirement and social security monthly income.

. . . .

In December 2006, when Bollinger was hospitalized with pneumonia, Shears moved $100,000 from his savings account to his checking account, where she could access it.

. . . .

The court finds that Shears utterly failed to properly or reasonably account for her management and use of Bollinger's funds and finances under any burden of proof. In essence, Shears presented a large bag of receipts that were incomplete, unorganized, incomprehensible in large part, inaccurate, and totally unsuitable for purposes of an accounting. She also failed utterly to keep any reasonable records of the time and services she performed while working as his care attendant.

While the Co-Guardians did not have the burden of production or proof to perform the accounting, they did so, and the court finds their accounting to be credible, accurate as far as they were able, and fair. The court accepts and adopts the accounting of the Co-Guardians.

The court finds that Shears was not a credible witness. Her testimony was often rambling, evasive, and argumentative. The explanations she provided regarding her alleged discussions with Bollinger and her demands for her earnings [were] frankly unbelievable. The court finds that with specific intent and undue influence she overbore the will of Bollinger, who was particularly vulnerable to her instigations, demands, and efforts to frighten him or bully him or persuade him to do things he would never have agreed to do in his earlier years (say, when Shears' mother was still alive). Shears preyed upon and took advantage of Bollinger's close relationship with her mother. Shears occasionally held herself out as Bollinger's relative. Shears' testimony was inconsistent at times, and always self-serving. Her financial decisions in the use of Bollinger's funds were selfish, fraudulent, and deceptive, and in every respect breached her trust and fiduciary duties to Bollinger. The court rejects Shears' testimony and claim that she and Bollinger entered into an oral or other agreement with respect to the purchase and ownership of the Joseph Street house, and with respect to her claim that Bollinger hired her to be a 24/7 in-home care giver at the rate of $25 per hour (or for any period, at any rate). There was no legally valid contract between Shears and Bollinger. Necessarily, there was no breach of any contract by Bollinger or his Co-Guardians. But for the willingness of the Co-Guardians to be fair to Shears under a quantum meruit theory (because it [was] undisputed that Shears did provide some minimum and basic care services to Bollinger), the court would award nothing to Shears for any of the services she performed, the reason being that all of her efforts to "care" for Bollinger were simply a part of her illegal and fraudulent scheme and plan to control and benefit from use of his property, money, and other resources.

The court finds that Bollinger's testimony, though limited by his physical infirmi-

ties, was clear on basic points. For example, he credibly explained that he couldn't say "no" to Shears.

The court finds that the testimony of the Co–Guardians was credible and fair. Indeed, the court cannot recall another case where a party made such an obvious effort to be fair to the adverse party where the adverse party did not deserve such solicitude. Time and again, the Co-Guardians were willing to give Shears credits even though the evidence would not have compelled such credits to be given. For example, the Co–Guardians contend that, in fairness to Shears, Shears should be given quantum meruit credit for some of the time that she spent providing some limited care and service to Bollinger. Because this is a case in equity, and because the court finds that Shears grossly breached her fiduciary duties to Bollinger and came to the court with unclean hands, the court would have been inclined to award Shears no quantum meruit credits.

The superior court later issued supplemental findings of fact and conclusions of law supporting and complementing its earlier preliminary findings of fact and conclusions of law. Shears does not contend any specific finding of fact underlying the superior court's judgment is clearly erroneous, and in our independent view the superior court's factual findings overwhelmingly support its legal conclusions.

■■■ We next address the unclean hands doctrine because it is dispositive of Shears's arguments that the superior court wrongly: (1) applied the doctrine; (2) barred her claim for compensation; (3) applied a three-year statute of limitations to her contract claim for compensation; and (4) calculated the weekly allowance she was entitled to receive from Bollinger. The unclean hands doctrine is an equitable defense barring a party from claims in equity.[9] To successfully raise an unclean hands defense, a party must show: "(1) that the [other party] perpetrated some wrongdoing; and

(2) that the wrongful act related to the action being litigated."[10] "[T]he wrongful act must be 'so closely related to the matter in litigation … as to affect the equitable relation of the parties to the suit.'"[11] The doctrine will not apply if the party asserting it fails to show that harm resulted from the alleged wrongful conduct.[12]

■■■ Shears argues the superior court erroneously applied the doctrine to her contract claim for compensation and the doctrine should not apply in any event because the court's finding—that she exercised undue influence over Bollinger to obtain material and financial gain—was unrelated to the work she did for him or to fair compensation for that work. Myers argues the court did not actually apply the doctrine because it allowed Shears a recovery. We disagree with both parties.

Shears fails to acknowledge that the superior court completely rejected her contract claim for wages and that she did not appeal that decision. The superior court's award was based not on Shears's legal claim but rather on her alternative equitable claim in quantum meruit, and because the superior court found Shears's unclean hands otherwise barred her from equitable relief, it limited any recovery in equity to the amount proposed by the co-guardians.

Here the record overwhelmingly supports the superior court's findings that Shears perpetrated fraud and breached her fiduciary duties. Shears repeatedly exerted influence over Bollinger for her personal gain by: (1) using his money to make numerous purchases for herself and to make other purchases for which she cannot account; (2) selling his car and keeping the proceeds; (3) purchasing a car with his money; and (4) inducing him to buy a house and to include her on the house's deed. Contrary to Shears's argument, these wrongful acts were directly related to Shears's work as Bollinger's caregiver, as she used her position to obtain material financial gains. For in-

---

**9.** *Id.* at 1082.

**10.** *Id.* (quoting *Knaebel v. Heiner*, 663 P.2d 551, 554 (Alaska 1983)).

**11.** *Id.* (quoting *Knaebel*, 663 P.2d at 554).

**12.** *Id.* (citing 27A Am Jur.2d *Equity* § 105).

stance, she used her position to gain access to Bollinger's checking account, to become a significant beneficiary in Bollinger's will, and to arrange the house purchase. Bollinger suffered significant financial losses as a result of Shears's conduct.

This case therefore presents a well-warranted application of the unclean hands doctrine, and we conclude the superior court did not abuse its discretion in applying the doctrine to Shears's equitable claim beyond that which the co-guardians conceded. Indeed, the superior court would have been well within its discretion to deny Shears equitable relief entirely,[13] as it said it would have done in the absence of the co-guardians' generosity.

█ Lastly, we conclude the superior court did not err in awarding the house title solely to Bollinger. Because the co-guardians acknowledged Shears contributed to the loan payments, Shears argues "she was deprived of her fair share of the home's equity." But Shears fails to realize that—according to the co-guardians' accounting which the superior court adopted and Shears failed to specifically challenge as clear error—there was no equity in the house and Bollinger suffered a net loss of about $20,000. Because Shears "[w]ith intent and using undue influence" induced Bollinger to purchase the house, Bollinger was properly given sole title, without credit to Shears, to prevent further prejudice to his rights and interests.[14]

## V. CONCLUSION

We AFFIRM the superior court's judgment.

CHRISTEN and STOWERS, Justices, not participating.

---

13. *Id.* (stating unclean hands defense allows court to entirely bar a party's equity claim).

14. *Cf.* AS 09.45.590:
When it appears that partition cannot be made equal between the parties according to their respective rights, without prejudice to the rights and interests of some of them, and a partition is ordered, the court may adjudge compensation to be made by one party to another on account of the inequality.