Bradley SHAFFER, Appellant,

v.

Kenneth BELLOWS, Ronald D. Bellows, and Marlys Dee Hanson, Appellees.

No. S–13894.

Supreme Court of Alaska.

Sept. 23, 2011.

&#8464;&rarr;461(1)

Z. Kent Sullivan, Baxter Bruce & Sullivan P.C., Juneau, for Appellant.

James W. McGowan, Sitka, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

Two men bought an island. After a dispute, they agreed that one would keep the island, while the other would receive a one-time payment and an option to buy the island at a fixed price, adjusted for inflation, if the owner ever chose to sell it. Years passed. The value of the island rose, far outpacing inflation. But the owner never elected to sell. Instead, he eventually conveyed the island to his sister, ostensibly as a gift. The option holder sued. The superior court held on summary judgment that the option remained viable, but that the gift was not improper. The option holder appeals. We affirm the superior court's interpretation of the option agreement, but because material facts are in dispute concerning contractual claims and allegations that the option hold-er's conveyance was fraudulent, we reverse and remand the superior court's grant of summary judgment on those claims.

## II. FACTS AND PROCEEDINGS

### A. Facts.

In 1981, Bradley Shaffer and Kenneth Bellows purchased Ring Island, a 4.6–acre property in Sitka. Shaffer and Bellows each contributed $25,000 as a down payment. As part of their purchase contract, Shaffer and Bellows were required to pay the previous owners $644 per month over approximately eight years. During the first nine months, Shaffer paid the entirety of each monthly payment. According to Shaffer, he and Bellows began arguing in early 1982 about how the property should ultimately be used.

On July 15, 1982, Shaffer quitclaimed his interest in the property to Bellows. Shaffer stated to the superior court that he received, in exchange for his quitclaim, repayment from Bellows of the money he had already spent, and "an option ... for purchase of the property." The nature and effect of this option (the Option Agreement) is the subject of the current dispute.

The Option Agreement reads in relevant part as follows:

> The Grantor, KENNETH BELLOWS ... hereby grants to BRADLEY SHAF-FER ... the [first] option to purchase the [Ring Island property.]
>
> . . . .
>
> This option shall take effect only in [the] event that Grantor elects to sell the above-described property. In this event he shall first provide BRADLEY SHAFFER with forty (40) days in which to purchase the property for a sales price to be determined as follows:
>
> The base sales price shall be $123,200. This amount shall be increased or decreased by the same percentage that the cost of living, according to the U.S. Department of Labor, Bureau of Labor Statistics evaluation of the State of Alaska, increases or decreases between the date of this Agreement; and the date Grantor notifies Bradley Shaffer of his intent to sell the property. The base sales price, adjust-

ed in this manner, shall be the actual sales price, if Bradley Shaffer elects to exercise this option.

On May 1, 2003, Bellows's attorney communicated to Shaffer's attorney that Bellows might be interested in negotiating a termination of the Option Agreement. In a videotaped deposition in August 2009, Bellows explained that he was seeking to have Shaffer's option terminated because it was "a block to financing." On May 12, 2003, Shaffer's attorney responded that Shaffer was not interested in discussing termination of the Option Agreement.

On January 30, 2006, Bellows quitclaimed the Ring Island property to his sister, Marlys Dee Hanson. According to the quitclaim deed, he did so as a gift. Bellows testified that Hanson gave him no consideration at the time, and that he could not remember receiving anything of great value in the years afterward, though he also noted elsewhere that "we share a lot of things mutually." In his August 2009 videotaped deposition, Bellows stated that he was still "not sure" whether Shaffer's option would be triggered if Hanson sold the land. When asked directly—"Do you believe that … gifting the property to your sister negated the option agreement with Mr. Shaffer?"—Bellows responded: "Good question. I don't know. It was never going to be for sale. It was always going to be in the family."

Shaffer has also asserted in the course of litigation that Bellows's gift of the property made Bellows insolvent, that neither Bellows nor Hanson noted the conveyance of the property to the IRS on their tax returns, and that Hanson had already been in possession of the property for years, "with substantial continuing use" by Bellows, such that the conveyance did not alter "the status quo of such use and possession." Shaffer submitted various documents that could provide a basis for inferring that Bellows had taken on excessive debt. During the August 2009 videotaped deposition, Bellows testified that his use of the property did not change after the

gift, and he did not deny that he did not record the gift of the property on his tax returns. Hanson testified that she had visited the property every two to three months in the wake of the 2006 gift, but started visiting the property more often from the spring of 2009.

In November 2007, after Shaffer learned of Bellows's 2006 quitclaim to Hanson, Shaffer's attorney sent Bellows a letter, asking Bellows to clarify "what your position is with regard to [Shaffer]'s rights pursuant to the Option Agreement." Bellows did not respond.

Meanwhile, the Ring Island property rose in value. At the time the Option Agreement was signed, the parties assigned it a fair market value of $123,200. According to Shaffer, by 2001 the property was worth approximately $800,000, and by late 2009, the property was worth approximately $890,000.[1] Shaffer later asserted, in 2009, that if he were allowed to exercise his option, he would be entitled to purchase the property for approximately $240,363.20.

### B. Proceedings.

In August 2008, several months after Bellows failed to respond to Shaffer's query regarding the effect of Bellows's 2006 quitclaim, Shaffer filed a complaint against Bellows, Hanson, Bellows's brother Ronald Bellows, ALPS Federal Credit Union, and "all other persons or parties unknown claiming a right, title, estate, lien, or interest" in the Ring Island property. The complaint contained five counts: (1) an action against all defendants for declaratory judgment; (2) an action against Bellows for breach of contract; (3) an action against Bellows for breach of the implied covenant of good faith and fair dealing; (4) an action against all defendants for violation of Alaska's prohibition against fraudulent conveyances under AS 34.40.010 and subsequent subsections; and (5) an action against all defendants for conspiracy to fraudulently convey property.[2]

---

1. Roughly $215,000 of this appreciation resulted from Bellows's improvements, and Shaffer told the superior court that, if he were to be granted

damages, an "offset" in this amount would be appropriate.

2. ALPS would eventually reach a stipulation with Shaffer allowing for its dismissal with prejudice

Defendants Bellows, Hanson, and Ronald Bellows then filed a motion for summary judgment. With regard to Shaffer's action for declaratory judgment, defendants conceded that Shaffer's option "[r]uns with the land," and thus that "the Option Agreement is still viable—and will be triggered if the property is ever sold."

In a written decision in April 2010, Superior Court Judge David V. George granted summary judgment to Shaffer on his action for declaratory judgment and summary judgment to Bellows and the other defendants on all remaining counts. Shaffer appeals the latter decisions.

## III. STANDARD OF REVIEW

 We review a grant of summary judgment "de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. All reasonable inferences are drawn in favor of the nonmovant in this examination."[3] Under the de novo standard, we "apply[ ] our independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy."[4]

## IV. DISCUSSION

### A. It Was Error To Grant Summary Judgment To Bellows And Hanson On Shaffer's Fraudulent Conveyance Claims.

#### 1. The wrong legal test was applied to the fraudulent conveyance claim.

Shaffer argues that the superior court erred in its legal analysis of the statute governing fraudulent conveyance claims, AS 34.40.010. This statute provides in relevant part: "[A] conveyance ... of an estate or interest in land ... made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, ... with the like intent, as against the persons so hindered, delayed, or defrauded is void."

The superior court relied on dicta from a footnote in *Asher v. Alkan Shelter, LLC*[5] to conclude that under Alaska law, any fraudulent conveyance requires four elements: "(1) an unlawful agreement, (2) the specific intent of each participant in the scheme to hinder, delay or defraud a creditor of a participant in the scheme, (3) acts taken in furtherance of the unlawful agreement, and (4) damages caused by those acts." The footnote in *Asher* in turn relies on a 1993 case, *Summers v. Hagen.*[6] But when the four elements in *Summers* are read in the context of the facts of the case, it is clear that they are meant to be the elements of *conspiracy* to fraudulently convey, not the elements of fraudulent conveyance.

We summarized the correct approach to fraudulent conveyance claims in *Nerox Power Systems, Inc. v. M–B Contracting Co.*[7]:

> The prohibition against fraudulent conveyances has been codified in Alaska law. The intent to defraud through a conveyance is a question of fact usually to be proved by circumstantial evidence. Many circumstantial factors can indicate the existence of fraud. Badges of fraud must be viewed within the context of each particular case.[8]

 Typical badges of fraud include: "(1) inadequate consideration, (2) transfer in anticipation of a pending suit, (3) insolvency of the transferor, (4) failure to record, (5) transfer encompasses substantially all the trans-

---

from the case. Shaffer would also eventually agree to the dismissal of Ronald Bellows, once it became clear that Ronald did not claim an interest in the Ring Island property.

**3.** *Smith v. Radecki,* 238 P.3d 111, 114 (Alaska 2010) (quoting *Beegan v. State, Dep't of Transp. & Pub. Facilities,* 195 P.3d 134, 138 (Alaska 2008)) (internal quotation marks omitted).

**4.** *Id.* (quoting *Jacob v. State, Dep't of Health & Soc. Servs.,* 177 P.3d 1181, 1184 (Alaska 2008)) (internal quotation marks omitted).

**5.** 212 P.3d 772, 782 n. 28 (Alaska 2009) (quoting *Summers v. Hagen,* 852 P.2d 1165, 1169–70 (Alaska 1993)).

**6.** 852 P.2d 1165.

**7.** 54 P.3d 791 (Alaska 2002).

**8.** *Id.* at 796 (footnotes and internal quotation marks omitted).

feror's property, (6) transferor retains possession of the transferred premises, (7) transfer completely depletes transferor's assets, and (8) relationship of the parties."[9]

*Nerox,* not *Asher,* accurately captures the elements required for a simple fraudulent conveyance claim under Alaska law. A fraudulent conveyance claim does not require plaintiffs to prove the four elements from *Summers.* We thus analyze Bellows's fraudulent conveyance claim under the badges of fraud analysis summarized in *Nerox.*

## 2. There is a genuine issue of material fact as to whether Bellows and Hanson engaged in a fraudulent conveyance.

The superior court concluded in dicta that under a badges of fraud analysis, Shaffer raised no genuine issues of material fact regarding defendants' fraudulent intent. By contrast, Shaffer argues on appeal that "[t]here are many factual issues related to whether the transfer of the Ring Island property was a fraudulent conveyance." Shaffer provides a detailed summary of evidence suggesting that the transfer displayed several badges of fraud.

■ In reviewing a summary judgment determination, we draw all factual inferences in favor of the non-moving party.[10] Alaska applies a lenient standard for withstanding summary judgment.[11] Applying that standard to the evidence before the superior court, we find several genuine issues of fact that relate materially to the badges of fraud. We list three examples.

■ First, there is a genuine issue of material fact as to whether the transfer was made for inadequate consideration, the first badge of fraud listed above. The superior

court treated inadequate consideration as irrelevant to the analysis of defendants' badges of fraud, explaining that "no consideration was ever intended" and that the transfer "was clearly a gift." This appears to be either a factual inference in Bellows's favor, accepting the notion that he made the conveyance as a gift solely out of love and affection for Hanson, in which case the inference is inappropriate in the summary judgment context; or it is the incorrect statement that debtors can as a rule evade this badge of fraud simply by claiming to make gifts. The factual issue of whether Bellows transferred the property for inadequate consideration is thus material to the badges of fraud analysis.

■ Second, there is a genuine issue of material fact as to whether the transfer was undertaken while Bellows was in or approaching insolvency,[12] the third badge of fraud above. The superior court recognized that there "may or may not be" evidence that Bellows was in financial distress. But the superior court treated potential evidence of Bellows's financial status as irrelevant: "[W]hether or not Mr. Bellows is insolvent doesn't seem to me to have any effect on the fraudulent intent in this transaction. Again, ... the land continues to be subject to your option in the event of a sale. So the option itself has not been frustrated or diminished." But if Bellows's insolvency could have resulted in the forced sale of his property, then there would be a great difference between the title being in Bellows's name or Hanson's. In the former case, Shaffer might end up purchasing the property in a forced sale; in the latter case, a forced sale would be unnecessary and Bellows might continue to use the property indefinitely with his sister's permission. The genuine issue of fact recog-

---

9. *Gabaig v. Gabaig,* 717 P.2d 835, 839 n. 6 (Alaska 1986) (citing *First Nat'l Bank of Fairbanks v. Enzler,* 537 P.2d 517, 522 (Alaska 1975)).

10. *Allstate Ins. Co. v. Dooley,* 243 P.3d 197, 200 (Alaska 2010) (citing *Lynden Inc. v. Walker,* 30 P.3d 609, 612 (Alaska 2001)).

11. *See, e.g., Estate of Milos v. Quality Asphalt Paving, Inc.,* 145 P.3d 533, 537 (Alaska 2006) (noting leniency of Alaska standard for finding genuine issue of material fact at summary judgment stage).

12. Black's Law Dictionary defines insolvency as "being unable to pay debts *as they fall due.*" BLACK'S LAW DICTIONARY 811 (8th ed. 2004) (emphasis added). Despite Shaffer's use of the term "insolvency," he does not appear to assert that Bellows has been unable to pay a debt *that has fallen due.* Rather, he seems to suggest that the ratio of Bellows's debts to his assets is somehow unsustainable.

nized by the superior court regarding Bellows's solvency is thus material to the badges of fraud analysis.

The revelation by Bellows's attorney, immediately after the superior court delivered its oral decision, that "Mr. Bellows is trying to do some refinancing on something," and that "[i]t's verging on being a big problem for him," further underscores the extent to which the early termination of this case may have obscured factual matters regarding Bellows's solvency that are relevant to the analysis of the badges of fraud.

■ Third, there is a genuine issue of material fact as to whether Bellows retained possession of the property, the sixth badge of fraud above. The superior court appears to have weighed the facts in Bellows's favor on this point, concluding that Bellows did not retain possession because "[t]he obvious[ ] evidence in the record is that Mr. Bellows has visited the property two times within one year and may have left some personal property on it from years before." But as Shaffer notes, some evidence suggested that Bellows never resided on the property, and that he continued to use it after the transfer of title very much as he did before. There is thus a genuine issue of material fact regarding Bellows's retained possession of the property.

■ In light of the above, we conclude that Shaffer raised genuine issues of material fact as to whether Bellows and Hanson engaged in a fraudulent conveyance under AS 34.40.010 according to the badges of fraud analysis set out in *Nerox*. We thus reverse the superior court's dismissal on summary judgment of Shaffer's fraudulent conveyance claim and remand for further proceedings. We note that on remand Shaffer may assert any arguments the evidence supports regarding the badges of fraud, not just those mentioned above.

### B. It Was Error To Grant Summary Judgment Against Shaffer On His Contract Claims.

#### 1. The superior court correctly interpreted the Option Agreement.

■■ We approach contract interpretation generally as a question of law.[13] We "look to extrinsic evidence of the parties' contractual intent only if the language of the instrument is ambiguous." [14]

In general, Shaffer argues that the Option Agreement is "a mixed-up blend between an option agreement and a right of first refusal." [15] He states that the Option Agreement leaves ambiguous whether Shaffer has the "right to invoke it." Though Shaffer's briefs never articulate the precise contours of this right, it is hard to see what he could mean other than that he claims some right to purchase the property even if Bellows never elects to sell it. But the Option Agreement could hardly be more clear in establishing that this is not the case. The Option Agreement states: "This option shall take effect only in [the] event that Grantor elects to sell the above-described property." "In the event" is a synonym of "[i]f it should happen," [16] a conditional phrase that contemplates the possibility of the event never coming to pass.

**13.** *AAA Valley Gravel, Inc. v. Totaro*, 219 P.3d 153, 160 (Alaska 2009) (citing *Norville v. Carr–Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004)).

**14.** *Id.* (citing *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999)).

**15.** In support of the notion that the Option Agreement is ambiguous between an option agreement and a right of first refusal, Shaffer quotes treatises that define these and related terms. But the definitions in other sources give rise to little or no ambiguity. Black's Law Dictionary, for example, defines an option agreement as "esp[ecially], a contractual obligation to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period." BLACK'S LAW DICTIONARY 1127 (8th ed. 2004). The "specified period" of Shaffer's option, in these terms, would be the 40 days after Bellows's notification of his election to sell. By contrast, the Option Agreement does not meet part of the core definition of a "right of first refusal," which is ·defined as "[a] potential buyer's contractual right *to meet the terms of a third party's higher offer.*" *Id.* at 1350 (emphasis added). We conclude that the agreement in question is an option agreement, not a right of first refusal.

**16.** WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 448 (1988) (defining "event").

In addition, another phrase from the Option Agreement that Shaffer discusses in depth—"The base sales price, adjusted in this manner, shall be the actual sales price, *if Bradley Shaffer elects to exercise this option*" (emphasis added)—plainly means that if Bellows elects to sell the property and Shaffer's option is thus triggered, then Shaffer may purchase the property at the stated price *if he chooses to do so*. The italicized phrase simply acknowledges that Shaffer is not required to buy the property if Bellows elects to sell, not that Shaffer has a right to exercise his option in the absence of Bellows's election to sell.

We thus affirm the superior court's determination that the terms of the Option Agreement unambiguously give Shaffer a right to purchase the Ring Island property if and only if Bellows elects to sell it. Because the Option Agreement is not ambiguous, the superior court did not err in declining to make further factual findings regarding the intent of the parties.[17]

### 2. There is a genuine issue of material fact as to Bellows's contractual claims.

Shaffer has presented three contractual claims in the course of this litigation: breach of contract, anticipatory breach, and breach of the implied covenant of good faith and fair dealing. If there is a genuine issue of material fact as to whether the conveyance to Hanson was a fraudulent conveyance, then *a fortiori* there is a genuine issue of material fact as to whether the conveyance was a

breach of the implied covenant of good faith and fair dealing. If upon further factual development it is determined that the conveyance involved some form of consideration, then there is also a question of whether the conveyance breached the explicit terms of the Option Agreement.

The superior court did not address the anticipatory breach theory in its summary judgment order. Shaffer did not raise anticipatory breach in his complaint before the superior court, though he did argue it in his opposition to defendants' motion for summary judgment, and he raised it in this appeal. We have on occasion chosen to treat claims similarly litigated in the trial court as preserved on appeal,[18] and we do so again here. On remand, we direct the superior court to consider Shaffer's anticipatory breach theory as part of its reconsideration of Shaffer's contractual claims.

### C. The Superior Court Must Determine The Option Agreement's Validity.

Neither party has squarely asserted that the Option Agreement constitutes an unreasonable restraint on alienation and is, as a result, unenforceable.[19] Nor did the superior court address this issue.[20]

We note that the Restatement (Third) of Property describes options to purchase land and rights of first refusal as "servitudes that directly restrain alienation of interests in land."[21] As such, they are "invalid if the restraint is unreasonable. Reasonableness is determined by weighing the utility of the restraint against the injurious consequences

---

17. *See Williams*, 982 P.2d at 253 (extrinsic evidence of intent only considered if contract is not intrinsically clear).

18. *See DeNardo v. Corneloup*, 163 P.3d 956, 961 (Alaska 2007) (plaintiff's "original complaint did not plead ultrahazardous activity, but he discussed it at the summary judgment oral argument, so we choose to treat the issue as preserved for appeal").

19. Shaffer raised the issue briefly in a pretrial memorandum, but only as support for adopting his interpretation of the contract. At oral argument before the superior court on March 12, 2010, Shaffer's attorney reiterated this argument regarding alienability and reformation. Bellows's attorney responded by suggesting that if

the Option Agreement were to be reformed, the court should consider rewriting it to expire after a certain amount of time. Shaffer repeats his argument regarding alienability and reformation in his brief on appeal, citing to his pretrial memorandum. Bellows and the other defendants make no mention of the alienability issue in their brief.

20. In response to Shaffer's pleading for a declaratory judgment that the Option Agreement "was a valid and enforceable agreement," the superior court did accept Bellows's and the other defendants' concession that the Option Agreement is valid and runs with the land.

21. Restatement (Third) of Property: Servitudes § 3.4 cmt. b (2000).

of enforcing the restraint."[22] A sister court has stated: "It is the generally accepted rule that a fixed price repurchase option of unlimited duration, independent of the lease, is an unreasonable restraint."[23] The explicit terms of the Option Agreement in this case appear to be of unlimited duration: If the option indeed runs with the land, it will persist indefinitely until an owner elects to sell the property. The Option Agreement also appears to offer Shaffer a largely fixed price, adjusted only for inflation.

If the terms of the Option Agreement are enforceable, then owners of the Ring Island property will have an incentive not to sell it so long as it has a value to them greater than the bargain price Shaffer or his successors would be able to pay—even if another potential buyer would be willing to pay far more and put the island to far more beneficial use. On remand, the parties may wish to address this issue, as well as the issue of how to reform the Option Agreement or otherwise achieve an equitable resolution if the Option Agreement is unenforceable.

## V. CONCLUSION

We AFFIRM the superior court's interpretation of the Option Agreement. We REVERSE and REMAND the superior court's dismissal on summary judgment of Shaffer's fraudulent conveyance and contractual claims. On remand, the parties may address the potentially dispositive question of whether the Option Agreement is legally enforceable, and if it is unenforceable, the consequences of its unenforceability.

---

**22.** *Id.*

**23.** *Iglehart v. Phillips*, 383 So.2d 610, 615 (Fla. 1980) (citing multiple authorities), cited with continuing approval by *Old Port Cove Holdings, Inc. v. Old Port Cove Condominium Ass'n One*, 986 So.2d 1279, 1288 n. 4 (Fla.2008) (holding that a right of first refusal of unlimited duration was not an unreasonable restraint on alienation where it was not for a fixed price); *see also* *Bortolotti v. Hayden*, 449 Mass. 193, 866 N.E.2d 882, 890–91 (2007) (contrasting the minimal restraint on alienation imposed by right of first refusal with greater restraint imposed by "an option to purchase at a fixed price," where owner is not "assured of receiving market value for his property" and might be "deterred from improving it or offering it for sale").