*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN P. BEARDSLEY, JANET N. BEARDSLEY, and SEAPORT AIR GROUP, LLC, | ) ) ) ) | Supreme Court No. S-17190 |
| | ) | Superior Court No. 1JU-09-00982 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | |
| | ) | No. 7481 – September 18, 2020 |
| ROBERT N. JACOBSEN & DARLENE F. JACOBSEN LIVING TRUST and WINGS AIRLINE SERVICES, INC., | ) ) ) ) ) | |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Lael A. Harrison, Faulkner Banfield, P.C., Juneau, and Albert N. Kennedy, Tonkon Torp, Portland, Oregon, for Appellants. Kristen P. Miller and E. Budd Simpson, Simpson, Tillinghast, Sheehan & Araujo, P.C., Juneau, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

Two business owners executed a series of transactions to sell a regional airline business.  Within two years of the sale, one of the buyer-controlled business entities declared bankruptcy, and the seller commenced litigation to resolve disputes over their agreements.  The parties settled before trial.  But another buyer-controlled entity later defaulted and declared bankruptcy, and the seller reinitiated litigation.

The sole issue on appeal is the extent to which the buyers personally guaranteed the obligations of the second bankrupt entity.  The superior court issued summary judgment in favor of the seller and held the buyers personally liable for those obligations.  We hold that whether the parties intended the buyers to personally guarantee the bankrupt entity's obligations is a disputed material fact.  The issue is therefore inappropriate for summary judgment, and we reverse.

## II.    FACTS AND PROCEEDINGS

### A.    The Initial Sale Of Wings Of Alaska

In 2008 the Robert N. Jacobsen and Darlene F. Jacobsen Living Trust orchestrated the sale of Alaska Juneau Aeronautics, Inc., doing business as Wings of Alaska, to John and Janet Beardsley.  The deal involved a series of agreements between various entities controlled by the Jacobsens and the Beardsleys, including a stock purchase agreement, the seller-financed purchase of an airplane hangar in Juneau, the lease of five aircraft, and the Beardsleys' personal guarantee of various aspects of the deal. As part of the sale, the parties also executed a memorandum of understanding. The memorandum's purpose was to provide a convenient summary of the transactions involved in the sale and to aid with interpreting the parties' intent.

As part of the stock purchase agreement, the Jacobsen Trust agreed to sell its entire ownership stake in Alaska Juneau Aeronautics, comprising 100% of outstanding shares, to SeaPort Air Group, LLC, an entity the Beardsleys established to

purchase Alaska Juneau Aeronautics, in exchange for cash. The Beardsleys personally guaranteed the stock sale. The stock purchase agreement acknowledged that it was one part of a larger deal involving the stock transfer and other agreements. The other agreements included the lease of five aircraft, a real estate exchange agreement related to the purchase of a hangar, and a separate personal guarantee agreement from the Beardsleys.

The parties executed the purchase of the aircraft hangar in three separate transactions. Wings Airline Services, Inc. owned the hangar and agreed to transfer title to the hangar to Fountain Village Development, a partnership owned by the Beardsleys, in exchange for title to four Oregon properties owned by Fountain Village Development and cash. In addition to the exchange agreement, Fountain Village Development granted Wings Airline Services a put option to require Fountain to repurchase the Oregon properties exchanged for the hangar. The agreement discounted the outstanding mortgage balances on those properties from the option price. The remaining balance was secured by a promissory note to Wings Airline Services. Wings Airline Services exercised its put option in a timely manner.

Wings Airline Services owned the five aircraft whose leases are at issue in this case. Prior to the sale of Wings of Alaska, Alaska Juneau Aeronautics leased the five aircraft from Wings Airline Services, and it was the intent of the parties that the aircraft would continue to be leased by Alaska Juneau Aeronautics after the Beardsleys took control of the business. Alaska Juneau Aeronautics entered into new leases with Wings Airline Services for two Cessna 208s and three Cessna 207s in April 2008. The parties intended that a Beardsley-controlled entity would eventually purchase the aircraft, but this never happened.

Finally, the Beardsleys agreed to guarantee personally any present or future debts and obligations of SeaPort Air Group with respect to the Jacobsen Trust. The

guarantee agreement (the 2008 guarantee) referenced the stock purchase agreement in its recitals, characterizing it as a broad agreement where stock and assets of the Jacobsen Trust were acquired by SeaPort Air Group through purchase, exchange, or lease-purchase. The memorandum of understanding stated that the parties intended for John and Janet Beardsley to guarantee payment and performance of transactions on behalf of SeaPort Air Group and SeaPort's affiliated entities.

## B. The 2010 Litigation

Fountain Village Development made advance payments of interest on the promissory note through June 2009. But in August Fountain Village Development defaulted. The Jacobsen Trust and Wings Airline Services filed suit against SeaPort Air Group, Alaska Juneau Aeronautics, Fountain Village Development, and the Beardsleys personally in November 2009. Fountain Village Development later filed for bankruptcy, and it was severed from the action. The suit was eventually settled between the parties.

The settlement consisted of a new series of agreements. These agreements were summarized and memorialized in a memorandum of settlement in March 2010. The agreements included a replacement promissory note, amendments to the airplane leases, a confession of judgment, a security agreement, and a new personal guarantee (the 2010 guarantee) by the Beardsleys.

The replacement promissory note removed Fountain Village Development and designated Alaska Juneau Aeronautics;[1] SeaPort Air Group; Janair, LLC; and the Beardsleys as makers of the note, jointly and severally. The note also included a cross-default provision, by which any breach or default by the makers under the deed of trust, the security agreement, the memorandum of settlement, or the aircraft leases would

---

[1] Alaska Juneau Aeronautics, Inc. renamed itself as SeaPort Airlines, Inc. in September 2010. We keep the name as Alaska Juneau Aeronautics for simplicity throughout this opinion.

constitute default on the note. And it incorporated an acceleration clause causing all payments on the note to come due upon default.

The parties amended the leases on the five aircraft to extend them through March 2012. Other lease changes included the removal of Alaska Juneau Aeronautics's unilateral option to extend the leases and the inclusion of a similar cross-default provision by which default on any of the other settlement agreements would trigger a default on the leases.

The confession of judgment's stated purpose was to simplify default procedures in the event of any future breach of the memorandum of settlement and related agreements. The confession defined "Debtors" as SeaPort Air Group, Alaska Juneau Aeronautics, and the Beardsleys, jointly and severally. It authorized the clerk of the court in the First Judicial District of Alaska at Juneau to enter judgment against the debtors for the full amount due under the memorandum of settlement, less any payments made upon filing the confession.

The 2010 guarantee was a condition of settlement in the pending litigation between the parties and listed the other agreements that were part of the same settlement. It bound the Beardsleys to SeaPort Air Group's and Fountain Village Development's debts and obligations due then or in the future as outlined in the memorandum of settlement and the other settlement documents.

### C.    The 2012 Leases

In February 2012 Robert Jacobsen and Robert McKinney, President of Alaska Juneau Aeronautics, began discussions on leasing the five aircraft beyond March of 2012. In April they signed agreements leasing the aircraft through March 2014. The 2012 leases left in place the rent and cross-default provisions from the 2010 lease amendments. The parties dispute whether the 2012 leases were intended as new leases to begin after termination of the old leases or whether they were intended as extensions

of the old leases. In March 2014 the parties extended the 2012 leases through March 2017.

### D. Default On The Leases, Alaska Juneau Aeronautics Bankruptcy, And Ensuing Litigation

In December 2015 Alaska Juneau Aeronautics defaulted on all five aircraft leases. The Jacobsens invoked the cross-default provision in the replacement promissory note, which triggered the note's acceleration clause.

In January 2016 the Jacobsens filed the confession of judgment with the superior court. Alaska Juneau Aeronautics later declared bankruptcy. The superior court issued an order in December 2016 that granted judgment on the confession and stayed the proceedings against Alaska Juneau Aeronautics. In February 2017 the court entered partial final judgment against the Beardsleys and SeaPort Air Group for the remaining principal on the replacement note plus interest, totaling approximately $1.35 million.

The only claim remaining and the sole issue on appeal concerns the extent to which the Beardsleys were personally liable for damages related to Alaska Juneau Aeronautics's failure to make lease payments. The parties filed competing motions for summary judgment on this issue. The arguments they raised are largely similar to arguments each party makes on appeal.

The Beardsleys claim that their personal guarantees do not apply to the Alaska Juneau Aeronautics leases. But even if the guarantees did apply to those leases initially, the Beardsleys argue that any leases referenced in the guarantee agreements expired in 2012. They assert that the leases the parties entered into in 2012 were new leases and were not covered by the older guarantees.

The Jacobsens claim that the intent of the parties was to craft a comprehensive set of agreements and guarantees that applied to all present and future obligations between the numerous entities involved. This included the Alaska Juneau

Aeronautics leases. They also argue that the 2012 leases were extensions of the old leases, not new leases. According to the Jacobsens, because the guarantees applied to extensions or renewals of obligations between the parties that could arise in the future, they continued to apply to the 2012 leases.

The superior court held that the 2008 guarantee covered the Alaska Juneau Aeronautics leases with Wings Airline Services. The court noted that the 2010 guarantee indicated the 2008 guarantee would remain in place and thus that the 2010 lease amendments were within the scope of the Beardsleys' 2010 personal guarantee as well. Finally, the court concluded that the 2012 leases were extensions of the earlier 2008 leases, not new leases. The court granted the Jacobsens' motion for summary judgment and denied the Beardsleys' motion. The Beardsleys appeal.

## III. STANDARDS OF REVIEW

"We review rulings on motions for summary judgment de novo, 'reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor.' 'Whether the evidence present[s] a genuine issue of material fact is a question of law that we independently review.' "[2]

"The goal of contractual interpretation is to give effect to the reasonable expectation of the parties."[3] In giving effect to those expectations, we generally decide the meaning of contractual language as a matter of law.[4] We give primary effect to the

---

[2]    *Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1160, 1166 (Alaska 2018) (footnote omitted) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014)).

[3]    *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004) (citing *Exxon Corp. v. State*, 40 P.3d 786, 793 (Alaska 2001)).

[4]    *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778
(continued...)

language of the contract but also consider extrinsic evidence of "the parties' intent at the time the contract was made."[5]  When the parties assert different intended meanings for contractual language, we first determine, as a matter of law, whether the contractual language "is reasonably susceptible to both asserted meanings."[6]  Only when both readings are reasonable does the parties' intent become a question of fact sufficient to overcome a motion for summary judgment.[7]

The standard of review we apply depends on the nature of the determination on appeal.  If the superior court has made a legal determination as to the meaning of contractual language, we review that legal determination de novo.[8]  If the superior court

---

[4]      (...continued)
P.2d 581, 584 (Alaska 1989) ("[Q]uestions of interpretation of the meaning of written documents are treated as questions of law for the court except where they are dependent for their resolution on conflicting extrinsic evidence.").

[5]      *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984); *see also Alaska Diversified Contractors*, 778 P.2d at 584 ("[T]he words of an integrated agreement remain the most important evidence of intention." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. b (AM. LAW INST. 1981))).

[6]      *Alaska Diversified Contractors*, 778 P.2d at 584.

[7]      *See K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 712 (Alaska 2003) ("[S]ummary judgment is improper when the evidence before the superior court establishes a factual dispute as to the intent of the contracting parties."); *W. Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 n.4 (Alaska 1991) ("Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings.  If the language is susceptible to both asserted meanings, then interpreting the contract is a question of fact for the jury." (citation omitted)).

[8]      *Monzingo v. Alaska Air Grp., Inc.*, 112 P.3d 655, 658-59 (Alaska 2005) ("[A] grant of summary judgment based upon contract interpretation is subject to de (continued...)

concludes that the contractual language is not reasonably susceptible to both parties' asserted meanings as a matter of law, we also review that conclusion de novo.[9] Finally, if the superior court determines that the contractual language is reasonably susceptible to more than one intended meaning and makes a factual determination as to the parties' intent when forming the contract, we review that finding for clear error.[10]

## IV.   DISCUSSION

The superior court concluded that despite its express terms, the 2008 guarantee bound the Beardsleys to the debts and obligations of Alaska Juneau Aeronautics with respect to the aircraft leases. We disagree with this conclusion. In doing so, we are guided by Alaska's long-standing "lenient standard for withstanding summary judgment."[11] We have noted that at trial the fact finder must weigh the evidence and resolve factual disputes in one party's favor.[12] But on summary judgment, the court should consider only "whether a reasonable person could believe the non-moving party's assertions and whether a reasonable person could conclude those

---

[8]      (...continued) novo review because interpretation of contract language is a question of law." (alteration in original) (quoting *K & K Recycling*, 80 P.3d at 711-12)).

[9]      *See Labrenz v. Burnett*, 218 P.3d 993, 997 (Alaska 2009) ("We review the superior court's legal conclusions de novo.").

[10]     *K & K Recycling*, 80 P.3d at 712 ("The intent of the parties when entering a contract is a question of fact and is thus reviewed under the clearly erroneous standard.").

[11]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014) (quoting *Shaffer v. Bellows*, 260 P.3d 1064, 1069 (Alaska 2011)).

[12]     *Id.*

assertions create a genuine dispute as to a material fact."[13] As long as there is "more than a scintilla of contrary evidence" a genuine dispute of material fact exists sufficient to deny summary judgment.[14]

Notwithstanding that the evidence supporting the superior court's grant of summary judgment appears compelling, we conclude there is a genuine dispute as to whether the parties intended the 2008 and 2010 guarantees to cover the obligations of Alaska Juneau Aeronautics. We also conclude there is a genuine dispute as to whether the parties intended the 2012 aircraft leases to be new leases or extensions of the old leases. These issues must be resolved at trial. For these reasons, we reverse the superior court's summary judgment order and remand for further proceedings.

## A. A Genuine Dispute Exists As To Whether The Beardsleys Personally Guaranteed The Obligations Of Alaska Juneau Aeronautics.

### 1. The language of the 2008 guarantee is reasonably susceptible to more than one intended meaning.

The Beardsleys argue that the parties never intended for the 2008 guarantee to bind them to the obligations of Alaska Juneau Aeronautics. They note that the leases were required to keep the Wings of Alaska business running. They assert that without the continued leases, Alaska Juneau Aeronautics stock would have had little value; the reference to the aircraft leases in the stock purchase agreement therefore makes sense independent of any personal guarantee by the Beardsleys. And they claim that the plain language of the other related agreements is consistent with this interpretation.

The Jacobsens contend that the parties intended the 2008 guarantee to cover all aspects of the business sale. They discuss the 2008 guarantee in context with the

---

[13]     *Id.*

[14]     *Kalenka v. Infinity Ins. Cos.*, 262 P.3d 602, 607 (Alaska 2011) (quoting *Beal v. McGuire*, 216 P.3d 1154, 1161 (Alaska 2009)).

contemporaneously executed memorandum of understanding and stock purchase agreement. And they argue that the stock purchase agreement expressly positioned the stock purchase as part of a comprehensive set of transactions that also included the ongoing leases of the aircraft, the purchase of the hangar, and the Beardsleys' personal guarantee. The Jacobsens contend there was no need for the Beardsleys to guarantee just the stock purchase since the Beardsleys fully paid for the stock in cash. The Jacobsens conclude that the guarantee was therefore meant to cover all transactions related to the sale of the airline.

We look first to the language of the 2008 guarantee and the other agreements the parties executed contemporaneously with that agreement. We then look to the memorandum of understanding as the only contemporaneous extrinsic evidence of the parties' intent at the time they formed the contracts. We conclude that reasonable people could find either parties' assertions to be true.

> **a.      Some language in the guarantee implies that the parties intended to bind the Beardsleys only to SeaPort Air Group's obligations and not those of any other entity.**

The 2008 guarantee expressly defines "Buyer" as SeaPort Air Group, "Seller" as the Jacobsen Trust, and "Guarantors" as John and Janet Beardsley. The key clause of the agreement states:

> Guarantors hereby guarantee irrevocably and unconditionally and promise to (i) pay . . . to the . . . Seller . . . all indebtedness now or hereafter due by Buyer to Seller that Buyer has incurred or . . . may incur . . . to Seller, including without limitation all indebtedness now or hereafter due by Buyer to Seller pursuant to the [Stock Purchase] Agreement . . . and (ii) perform or cause to be performed any other obligation . . . of Buyer, which Buyer has or may hereafter have due to Seller, including without limitation any obligation due or to be performed by Buyer to Seller under the [Stock Purchase] Agreement . . . .

This language suggests that the Beardsleys were responsible for payment of any debts or performance of any obligations SeaPort Air Group may have had with respect to the Jacobsen Trust, including any debts or obligations SeaPort Air Group may have had under the terms of the stock purchase agreement.

The stock purchase agreement references the Alaska Juneau Aeronautics aircraft leases with Wings Airline Services. But according to the terms of the 2008 guarantee, the Beardsleys would be responsible for obligations under the aircraft leases only if they were obligations that SeaPort Air Group owed to the Jacobsen Trust. And they were not. The leases were an agreement between Alaska Juneau Aeronautics and Wings Airline Services. The leases did not bind SeaPort Air Group to these obligations, nor did they assign rights under the leases to the Jacobsen Trust. The Jacobsens contend that the Beardsleys are liable for all obligations mentioned in the stock purchase agreement. But that is not what the plain language of the 2008 guarantee states. The guarantee binds the Beardsleys to any obligations SeaPort Air Group may have had with respect to the Jacobsen Trust under terms of the stock purchase agreement, not all obligations mentioned in that agreement.

**b.    Other language in the guarantee implies that the parties intended the Beardsleys' guarantee to be broader.**

The first recital in the 2008 guarantee describes the stock purchase agreement as a document between SeaPort Air Group and the Jacobsen Trust that orchestrates the "purchase, exchange, or lease-purchase" of stock and other assets owned by the Trust and its affiliated, owned, or controlled entities. This language implies that the parties viewed the stock purchase agreement as a comprehensive document encompassing all aspects of the business sale.

The Beardsleys note that the reference to "lease-purchase" in the guarantee only provides context and positions the guarantee as one of several agreements related

to the sale of Wings of Alaska. But it does more than just position the guarantee in context with the other agreements. It characterizes the stock purchase agreement as a document that encompasses the entire transaction.

After describing the stock purchase agreement, the guarantee then binds the Beardsleys to obligations under the stock purchase agreement. The description of the stock purchase agreement as a comprehensive document covering all aspects of the business sale and the binding of the Beardsleys to that comprehensive set of obligations implies that the parties may have intended the guarantee to be broader than merely covering the obligations of SeaPort Air Group.

### c. Language in the stock purchase agreement corroborates this broader understanding.

The stock purchase agreement expressly identifies the "Other Agreements" that were part of the airline sale to include the aircraft leases, the real estate exchange agreement for the hangar, and the Beardsleys' personal guarantee. Article II of the stock purchase agreement states that these other agreements are incorporated by reference. And section 4.2 states that the stock purchase agreement and the other listed agreements are legal, valid, and binding obligations of SeaPort Air Group and the Beardsleys personally, enforceable against Sea Port Air Group and the Beardsleys. This language implies that the parties may have intended for the Beardsleys to guarantee all of the obligations identified in the stock purchase agreement and in the other agreements associated with the sale of the airline business.

### d. The memorandum of understanding reinforces a broader reading.

The memorandum of understanding first outlines the set of transactions that were part of the airline business sale. These include the stock purchase agreement, the aircraft leases, and the exchange agreement for purchase of the hangar. After

documenting each transaction, the memorandum states: "John P. Beardsley and Janet N. Beardsley agree to guarantee the payment and performance of the related transactions on behalf of SeaPort [Air Group] and the Buyer's affiliated entities." The memorandum defines "Buyer" as SeaPort Air Group, LLC "and certain affiliated entities." This language implies that the parties intended for the Beardsleys to guarantee performance of SeaPort Air Group's obligations and the obligations of any of SeaPort Air Group's affiliates.

After SeaPort Air Group acquired 100% of Alaska Juneau Aeronautics under the terms of the stock purchase agreement, Alaska Juneau Aeronautics became an affiliate of SeaPort Air Group.[15] The memorandum of understanding therefore states that the parties intended for the Beardsleys to guarantee payment and performance of Alaska Juneau Aeronautics on the aircraft leases.

The Beardsleys argue that the memorandum of understanding, by its terms, can be used only as an aid to determine intent. They contend that, in the event there is a conflict between the memorandum and another agreement, the specific agreement controls. They also argue that the reference in the memorandum to SeaPort Air Group's affiliated entities can bind the Beardsleys to the obligations of the affiliated entities only if the other agreements expressly so indicate. But in interpreting the agreements, we

---

[15] AS 10.06.990(2) defines "affiliate" as "a person that directly or indirectly . . . controls, or is controlled by, or is under common control with, a corporation subject to [the Alaska Corporations Code]." AS 10.06.990(12)(A) defines "control" as "owning directly or indirectly, or having the power to vote, 25 percent or more of a class of voting securities of a corporation subject to [the Alaska Corporations Code]." SeaPort Air Group purchased 100% of Alaska Juneau Aeronautics's outstanding shares. Thus, Alaska Juneau Aeronautics was controlled by and an affiliate of SeaPort Air Group.

"give effect to the reasonable expectations of the parties"[16] by looking to the language of the agreements but also to the parties' intent.[17] The memorandum of understanding expressly provides that it may be used to determine the parties' intent with respect to the relationship between the guarantee and the other agreements. Here, the memorandum favors the interpretation that the parties intended for the Beardsleys to guarantee the obligations of SeaPort Air Group and any of its affiliates. This includes the obligations of Alaska Juneau Aeronautics for the aircraft leases.

### e.     A reasonable person could find both parties' assertions to be true.

The above analysis shows that reasonable arguments exist both that the 2008 guarantee did not cover the obligations of Alaska Juneau Aeronautics and that it did. In favor of the Beardsleys, we note that this case involves two sophisticated parties. And the parties were careful to list and bind the Beardsleys in their various capacities when they wanted to do so. The Beardsleys signed the 2008 guarantee, the memorandum of understanding, and the stock purchase agreement as individuals, and John Beardsley also signed these documents as General Manager of SeaPort Air Group. The Beardsleys signed the first promissory note as individuals, and John Beardsley signed as partner of Fountain Village Development. John Beardsley signed the exchange agreement and the put option agreement as partner of Fountain Village Development. But the leases were signed only by the CEO of Alaska Juneau Aeronautics. The leases also make no mention of the Beardsleys' personal guarantee, counter to language in the other documents. It is reasonable to conclude that these discrepancies in the documents were intentional.

---

[16]     *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004) (citing *Exxon Corp. v. State*, 40 P.3d 786, 793 (Alaska 2001)).

[17]     *Norton v. Herron*, 677 P.2d 877, 880 (Alaska 1984).

Likewise it seems reasonable that the Jacobsens would want guarantees on all aspects of the deal. Much of the language in the documents appears to be comprehensive, and it seems clear the Jacobsens attempted to cover all bases. Because entities were involved in some of the transactions that ordinarily would have shielded the Beardsleys from liability, it would be reasonable for the Jacobsens to demand that personal guarantees were present.

It may be that at trial the trier of fact would find it more likely than not that the parties intended the 2008 guarantee to cover the aircraft leases. But the language of the 2008 guarantee and related agreements is reasonably susceptible to both parties' asserted meanings. So long as there is "more than a scintilla" of evidence supporting both sides of the argument, a genuine factual dispute exists.[18] Determination of the parties' intent with respect to the 2008 guarantee therefore presents a genuine issue of material fact inappropriate for summary judgment.

### 2. The language of the 2010 guarantee is reasonably susceptible to more than one intended meaning.

The parties assert largely similar arguments with respect to their intent when executing the agreements related to their 2010 settlement. The Beardsleys contend that the 2010 guarantee, like the 2008 guarantee, does not list Alaska Juneau Aeronautics as a "Buyer." The parties added the obligations of Fountain Village Development to the 2010 guarantee, but not any other entity. The Beardsleys also note that the parties were again careful to ensure the Beardsleys signed each of the agreements that were part of the 2010 settlement in the appropriate capacity. They argue that because the parties took care to ensure each agreement explicitly listed those entities they wished to bind, the lack

---

[18] *Kalenka*, 262 P.3d at 607 (quoting *Beal*, 216 P.3d at 1161).

of any mention of Alaska Juneau Aeronautics in the 2010 guarantee must have been intentional.

The Jacobsens counter that in light of the breaches to the 2008 agreements and Fountain Village Development's subsequent bankruptcy, the parties crafted the 2010 settlement agreements to ensure the Jacobsens would be adequately protected in the event of future default by any of the entities. This included inserting cross-default provisions into the leases and the replacement promissory note and removing the Beardsleys' unilateral option to extend the aircraft leases.

We conclude that despite additional protections the Jacobsens put in place as part of the 2010 settlement, a reasonable person could still discern a genuine dispute as to whether the Beardsleys' personal guarantee included the obligations of Alaska Juneau Aeronautics. The issue therefore remains a disputed material fact that must wait until trial for proper resolution.

**a.    The 2010 settlement agreements show an intent to comprehensively protect the Jacobsens' interests.**

By its terms the 2010 memorandum of settlement memorialized the parties' settlement agreement. It summarized all of the agreements that were part of the settlement, including the amendments to the aircraft leases with Alaska Juneau Aeronautics. It stated that the Beardsleys' personal guarantee would provide security for the various agreements. It was signed by John Beardsley on behalf of all the entities the Beardsleys controlled: SeaPort Air Group, Fountain Village Development, and Alaska Juneau Aeronautics. John and Janet Beardsley also signed the memorandum as individuals. Finally, it allowed entry of confession of judgment in the event of any future breach by any of the defendants. These defendants included Alaska Juneau Aeronautics. The memorandum thus appears to bind Alaska Juneau Aeronautics to the terms of the

settlement and allows for simplified default procedures in the event of a future breach of the leases.

Similar to the memorandum, the confession of judgment included a broad list of the entities liable under the confession, including Alaska Juneau Aeronautics. It was signed by John Beardsley as Managing Member of SeaPort Air Group and Chairman of Alaska Juneau Aeronautics and by the Beardsleys as individuals. It empowered the clerk of the court to enter judgment against all of the listed entities "for the full amount due . . . under the [memorandum of settlement]."

It is true, as the Beardsleys note in their briefing, that the confession described the judgment amount only in terms of the money due on the replacement promissory note. But this language did not limit the confession of judgment only to the outstanding value of the replacement note. By cabining its reference to a specific amount due with the phrase "as of June 1, 2010," the confession anticipated that the amount due was not final as of execution of the agreement. Rather, it would be calculated only if and when a court entered judgment against the Beardsleys and the other listed entities. Moreover, by its terms, the confession indicated judgment could be entered for the full amount due under the memorandum of settlement. The memorandum of settlement incorporated the extensions to the aircraft leases. The confession therefore allows entry of judgment for the amount due under the aircraft leases.

The parties also took care to add cross-default provisions to the promissory note and the leases that were not present previously. This implies an intent in 2010 to allow the Jacobsens to collect on all of their outstanding debt at the first sign of future trouble by any of the entities involved. The replacement promissory note also bound all of the Beardsley-controlled entities to its obligations. It was signed by John Beardsley as Managing Member of SeaPort Air Group and Janair and as Chairman of Alaska

Juneau Aeronautics[19] and by the Beardsleys individually. As with the memorandum of settlement and the confession of judgment, these facts imply an intent to comprehensively protect the Jacobsens' rights under the 2010 settlement.

### b. The plain language of the 2010 guarantee favors a narrower reading.

The plain language of the 2010 guarantee remains an important indicator of the intentions of these two sophisticated parties. And the language is relatively clear. The Jacobsens took the opportunity in 2010 to define "Buyers" more broadly than they did in 2008 and added Fountain Village Development's obligations to the agreement. But the 2010 guarantee makes no mention of Alaska Juneau Aeronautics. We must contrast this absence with the care taken to ensure all relevant entity representatives signed the individual agreements to which they were parties. It begs the question why Alaska Juneau Aeronautics would have been left out of the 2010 guarantee if the intention were to bind the Beardsleys to that company's obligations.

### c. A reasonable person could find either parties' assertions to be true.

Despite the additional protections the Jacobsens implemented in 2010 to protect their interests, we conclude that the extent of the Beardsleys' personal guarantee is a disputed material fact that cannot be resolved on summary judgment. We believe this case provides an important illustration of Alaska's summary judgment standard, and we take this opportunity to emphasize our long-standing support for "preserving the right to have factual questions resolved by a trier of fact only after following the procedures

---

[19] The replacement promissory note is actually signed by John Beardsley as Chairman of SeaPort Airlines, Inc. because Alaska Juneau Aeronautics changed names to SeaPort Airlines, Inc. in 2010. But as noted above, *see supra* note 1, we continue to use Alaska Juneau Aeronautics for simplicity.

of a trial."[20] When the parties to a contract assert different intentions with respect to contractual language, only when no reasonable person could discern a genuine dispute regarding contractual intent should a court resolve that question on summary judgment. Reasonable people could conclude either that the parties intended to bind the Beardsleys to the obligations of Alaska Juneau Aeronautics, or that they did not. This is a question the trier of fact must resolve at trial.

B.     A Genuine Dispute Exists Regarding Whether The Beardsleys' Personal Guarantees Extended To The 2012 Leases.

If we assume for the sake of analysis that the Beardsleys personally guaranteed the obligations of Alaska Juneau Aeronautics in 2008 and 2010, this case could turn on whether the 2012 lease agreements were new leases or extensions. Both the 2008 and 2010 guarantees state that the Beardsleys "shall not be released, relieved, discharged or otherwise affected by . . . any extension[ or] renewal" of their obligations under the guarantees. This language implies that if the parties extended or renewed the aircraft leases subsequent to their expiration in 2012, the personal guarantees would continue to bind the Beardsleys to those lease obligations. If on the other hand the parties decided to enter into an entirely new set of lease agreements, the guarantees would not bind the Beardsleys personally to obligations under the new agreements.

The superior court considered whether the 2012 leases were extensions of the old leases or entirely new agreements and concluded that though the 2012 leases expressly stated they were new leases, they were "for all practical purposes . . . extension[s] of the old lease[s]." But it was error to resolve this issue on summary judgment. Whether the parties intended the 2012 leases to be new leases or extensions of the old leases is a disputed material fact.

---

[20]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 521 (Alaska 2014).

The Beardsleys argue that the 2012 leases are wholly new agreements, pointing to language that states they are "new Aircraft Lease Agreement[s]." The Jacobsens highlight language in the 2012 leases referencing the 2008 leases and note that the 2012 leases contain substantially similar language to the 2008 leases and the 2010 lease amendments. They argue that the parties intended to renew the old leases once they expired in 2012.

The form of the 2012 leases suggests they are extensions to the original 2008 leases. The 2012 leases are structured to include a primary lease agreement, outlining common provisions applicable to all five aircraft, along with lease supplements specific to each aircraft. The 2008 leases are structured identically.

The terms of the 2012 leases also largely match terms from the 2008 leases and the 2010 amendments. The 2010 cross-default provisions are incorporated directly into the text of the 2012 leases. Other terms in the 2012 leases are identical to provisions in the 2008 leases. These similarities suggest a relationship between the 2012 leases and their earlier counterparts, not that the parties contracted for an entirely new set of rights and obligations.

But we again observe that the Beardsleys and the Jacobsens were sophisticated parties represented by counsel. As such, we must give deference to the language of the documents they executed. And the plain language of the 2012 leases states that these were "new" leases. The Alaska Juneau Aeronautics board resolution adopting the 2012 leases also indicated that the old leases were about to expire and that the 2012 leases were "new" leases. These facts support a conclusion that the parties considered the 2012 leases to be new, not amendments or extensions to the old leases.

The parties' intent with respect to these leases constitutes a disputed material fact sufficient to deny summary judgment.[21]

## V. CONCLUSION

We REVERSE the superior court's order granting summary judgment in favor of the Jacobsens and REMAND for further proceedings.

---

[21] *See id.* at 519 (defining material fact to be "one upon which resolution of an issue turns").